UNITED STATES DISTRICT COURT

EASTERN DISTRICT OF CALIFORNIA

----oo0oo----

| | |
|---|---|
| FAUN O'NEEL, individually and as Guardian Ad Litem for her children B.T., A.O., D.O., and A.T., | No. 2:21-cv-02403 WBS DB |
| Plaintiffs, | ORDER RE: DEFENDANTS' MOTION FOR JUDGMENT ON THE PLEADINGS |
| v. | |
| CITY OF FOLSOM, a public entity; SPENSER HEICHLINGER, an individual; MELANIE CATANIO, an individual; LOU WRIGHT, an individual; [FNU] AUSTIN, an individual; [FNU] HUSAR, an individual, DOE CITY OF FOLSOM DEFENDANTS, individuals; COUNTY OF SACRAMENTO, a public entity; DOE DCFAS DEFENDANTS, individuals; and DOES 1 through 10, inclusive, | |
| Defendants. | |

----oo0oo----

Plaintiff Faun O'Neel, individually and on behalf of her children B.T., A.O., D.O., and A.T. (collectively, "plaintiffs"), brought this § 1983 action against the City of

1

Folsom (the "City"); various Folsom police officers; the County of Sacramento; and various Sacramento Department of Child, Family and Adult Services officials challenging defendants' alleged unlawful entry of O'Neel's home and their alleged unlawful seizure and removal of B.T., A.O., D.O., and A.T.  (See First Amended Complaint ("FAC") (Docket No. 18).)  Specifically, plaintiffs assert claims for (1) warrantless seizure of children under the Fourth Amendment and denial of due process under the Fourteenth Amendment, (2) unlawful search under the Fourth Amendment; (3) municipal liability; (4) false imprisonment; and (5) intentional infliction of emotional distress.  (Id. at ¶¶ 56-110.)  Defendants City of Folsom, Spenser Heichlinger, Melanie Catanio, Lou Wright, [FNU] Austin, and [FNU] Husar now move for judgment on the pleadings.  (Mot. (Docket No. 23-1).)[1]

I.   Factual and Procedural Background[2]

Plaintiff O'Neel is a resident of the County of Sacramento and is married, with four minor children: B.T., A.T., A.O., and D.O.  (FAC at ¶¶ 1, 24, 26.)  On December 20, 2020, before the family left home to go to dinner, O'Neel asked D.O. to put away some cookies so that the dog would not get to them while the family was out.  (Id. at ¶ 31.)  When the family returned, O'Neel saw that the cookies had not been put away and that the

---

[1]   Because only the City of Folsom and the Folsom police officer defendants are party to the instant motion, in this Order the court uses "defendants" to refer only to the Folsom defendants, notwithstanding the fact that they are not the only defendants in this action.

[2]   All facts described herein are as alleged in the First Amended Complaint except as otherwise noted.

dog had eaten most of them and made a mess in the kitchen.  (Id. at ¶ 32.)  O'Neel called D.O. over to clean up the mess, and after he had done so she sent him to his room as a form of discipline.  (Id. at ¶ 33.)

At around 9:00 p.m., there was loud banging at the front door, which O'Neel's husband opened to find defendant officers Heichlinger, Austin, and Husar standing at the entryway.  (Id. at ¶ 34.)  They informed him that they were there to carry out a welfare check on the children because B.T. had called 911 to ask whether grabbing a child by the neck was child abuse.  (Id. at ¶ 35.)  Evidently, after being made to clean the kitchen, D.O. had gone to B.T.'s room and falsely stated that O'Neel had picked D.O. up by the neck and carried him to the kitchen.  (Id.)

The officers then entered the home without O'Neel's or her husband's consent and without a warrant.  (Id. at ¶ 37.)  They ordered O'Neel and her husband to wake the children up so they could be interviewed and proceeded to interview each child outside the presence of O'Neel and her husband.  (Id.)  The officers then photographed D.O., who had no marks or bruises on him.  (Id.)  The officers then left without interviewing anyone else who was at the home or providing any paperwork, contact information, or any indication of what might happen next.  (Id. at ¶¶ 38-39.)

Plaintiffs allege that the following day, one or more City officials contacted Sacramento Department of Child, Family and Adult Services to file a report of suspected child abuse.  (Id. at ¶ 40.)  Plaintiffs further allege that multiple City and County defendants agreed to seize the four children from O'Neel's

care and custody without seeking court authorization, despite the lack of any imminent risk of serious bodily injury to any of the children.  (Id. at ¶ 41.)

Between the December 20, 2022 welfare check and December 22, 2022, there were no further incidents involving the children.  (Id. at ¶ 42.)  Plaintiffs also allege that no further investigation occurred during this time.  (Id.)  Nevertheless, on December 22, defendant officers Catanio, Wright, and Does 1 through 4 came to plaintiffs' home and informed O'Neel that they were there to seize all of the children and remove them from her custody.  (Id.)  None of the defendants presented a warrant or court order authorizing seizure of the children.  (Id. at ¶ 43.)  These officers entered the home without O'Neel's or her husband's consent and ordered O'Neel and her husband to bring the children to the officers so the children could be interviewed again.  (Id. at ¶ 44.)  Catanio interviewed the children without parental consent and outside of O'Neel's presence.  (Id. at ¶ 47.)

Plaintiffs allege that Catanio did not gain any new information from the December 22 interviews of the children.  (Id. at ¶ 48.)  Notwithstanding the lack of any indication any child was at imminent risk of serious harm, after the interviews the defendant officers removed all four children from O'Neel's home, drove the children to the Folsom Police Department, and continued to interrogate the children.  (Id. at ¶¶ 48-49.)  O'Neel's mother sought to have the children placed in her care, but defendants refused and instead decided to place the children in non-relative foster care.  (Id. at ¶¶ 50-52.)

Plaintiffs served a government claim against the City

4

1   on June 16, 2021, which the City rejected on June 24, 2021. (<u>Id.</u>

2   at ¶ 54.)  Plaintiffs brought this action in this court on

3   December 24, 2021.  (Docket No. 1.)

4   II.  <u>Legal Standard</u>

5           "After the pleadings are closed -- but early enough not

6   to delay trial -- a party may move for judgment on the

7   pleadings."  Fed. R. Civ. P. 12(c).  A Rule 12(c) motion may ask

8   for judgment on the basis of a plaintiff's "[f]ailure to state a

9   claim upon which relief can be granted."  Fed. R. Civ. P.

10  12(h)(2)(B).  "A Rule 12(c) motion for judgment on the pleadings

11  and a Rule 12(b)(6) motion to dismiss are virtually

12  interchangeable."[3]  <u>Sprint Telephony PCS, L.P. v. Cnty. of San</u>

13  <u>Diego</u>, 311 F. Supp. 2d 898, 902 (S.D. Cal. 2004).  "Because the

14  two motions are analyzed under the same standard, a court

15  considering a motion for judgment on the pleadings may give leave

16  to amend and 'may dismiss causes of action rather than grant

17  judgment.'"  <u>Id.</u> at 903 (citing William W. Schwarzer, et al.,

18  <u>Federal Civil Procedure Before Trial</u> § 9:341 (2003); <u>Moran v.</u>

19  <u>Peralta Cmty. Coll. Dist.</u>, 825 F. Supp. 891, 893 (N.D. Cal.

20  1993)).

21          As with a motion to dismiss made under Rule 12(b)(6),

22

23          [3]   "The motions differ in only two respects: '(1) the
    timing (a motion for judgment on the pleadings is usually brought
24  after an answer has been filed, whereas a motion to dismiss is
    typically brought before an answer is filed), and (2) the party
25  bringing the motion (a motion to dismiss may be brought only by
    the party against whom the claim for relief is made, usually the
26  defendant, whereas a motion for judgment on the pleadings may be
    brought by any party).'"  <u>Lewis v. Russell</u>, 838 F. Supp. 2d 1063,
27  1067 n.2 (E.D. Cal. 2012) (Shubb, J.) (quoting <u>Sprint</u>, 311 F.
    Supp. 2d at 902-03).
28

the inquiry before the court is whether, accepting the allegations in the complaint as true and drawing all reasonable inferences in the plaintiff's favor, the complaint has alleged "sufficient facts . . . to support a cognizable legal theory," Navarro v. Block, 250 F.3d 729, 732 (9th Cir. 2001), and thereby stated "a claim to relief that is plausible on its face," Bell Atl. Corp. v. Twombly, 550 U.S. 544, 570 (2007).  In deciding the motion, the court must accept all factual allegations in the complaint as true and construe them in the light most favorable to the non-moving party.  Fleming v. Pickard, 581 F.3d 922, 925 (9th Cir. 2009) (citing Turner v. Cook, 362 F.3d 1219, 1225 (9th Cir. 2004)).  Courts are not, however, "required to accept as true allegations that are merely conclusory, unwarranted deductions of fact, or unreasonable inferences." Sprewell v. Golden State Warriors, 266 F.3d 979, 988 (9th Cir. 2001).

III. Discussion

Defendants move for judgment on several of plaintiffs' claims, on multiple grounds.  The court will address each in turn.  Because the court has discretion to consider a motion for judgment on the pleadings as it would a motion to dismiss, and because no evidence is currently before the court, the court declines to grant judgment at this stage and will instead consider whether the challenged claims merit dismissal.  See Sprint, 311 F. Supp. 2d at 903.

Certain claims brought by plaintiffs primarily concern defendants' alleged entry into plaintiffs' home on December 20, 2020, whereas others primarily concern defendants' alleged conduct on December 22, 2020, including removing B.T., A.T.,

A.O., and D.O. from their home.  The court will first address
defendants' arguments for dismissal of the former category of
claims, followed by those for dismissal of the latter category.[4]

    A.   Claims Based on December 20 Entry

          1.   Qualified Immunity

    In the First Amended Complaint, plaintiffs claim
defendants are liable for unlawful searches of their home, based
on defendants' alleged warrantless entries on December 20 and 22,
2022.  (See FAC at ¶¶ 70-76.)  Defendants argue that defendants
Heichlinger, Austin, and Husar are entitled to qualified immunity
as to their alleged unlawful entry on December 20, 2022.  (Mot.
at 8.)[5]

    In § 1983 actions, qualified immunity "protects
government officials 'from liability for civil damages insofar as
their conduct does not violate clearly established statutory or
constitutional rights of which a reasonable person would have

---

    [4]   In their motion, defendants argued that (1) plaintiffs'
claims for damages were barred pursuant to California Government
Code § 945.3 and (2) the court should abstain from exercising
jurisdiction over the action under Younger v. Harris, 401 U.S. 37
(1971), and its progeny, due to a criminal prosecution that was
pending against plaintiff O'Neel in state court.  (Mot. at 3-5;
see Reply at 2-5 (Docket No. 25).)  However, the parties have
since notified the court that the pending criminal charge has
been dropped, and defendants state that they withdraw these two
arguments.  (Docket Nos. 27-29.)  Accordingly, the court will not
address them in this Order.

    Because defendants' request for judicial notice (Docket
No. 23-2) appears to pertain exclusively to these arguments, that
request is denied as unnecessary to the resolution of the instant
motion.

    [5]   Defendants have not raised qualified immunity as to
plaintiffs' other claims, challenging defendants' alleged
unlawful entry of plaintiffs' home and removal of the children on
December 22, 2020.  (See Mot. at 8-9.)

known.'" <u>Pearson v. Callahan</u>, 555 U.S. 223, 231 (2009) (quoting <u>Harlow v. Fitzgerald</u>, 457 U.S. 800, 818 (1982)).  To determine whether an officer is entitled to qualified immunity, the court considers (1) whether there has been a violation of a constitutional right and (2) whether the defendants' conduct violated "clearly established" federal law.  <u>Sharp v. Cnty. of Orange</u>, 871 F.3d 901, 909 (9th Cir. 2017) (citation omitted). The court has discretion to decide which prong to address first and, if analysis of one proves dispositive, the court need not analyze the other.  <u>See Pearson</u>, 555 U.S. at 236.  Here, the court will exercise its discretion to analyze the second prong first: whether defendants' conduct violated a clearly established constitutional right.

"A right is clearly established when it is 'sufficiently clear that every reasonable official would have understood that what he is doing violates that right.'"  <u>Rivas-Villegas v. Cortesluna</u>, 142 S. Ct. 4, 7 (2021) (quoting <u>Mullenix v. Luna</u>, 577 U.S. 7, 11 (2015)).  When determining whether a right is clearly established, the court may not "define clearly established law at a high level of generality."  <u>Kisela v. Hughes</u>, 138 S. Ct. 1148, 1152 (2018) (quoting <u>Ashcroft v. Al-Kidd</u>, 563 U.S. 731, 742 (2011)).  Rather, "[t]his inquiry must be undertaken in light of the specific context of the case."  <u>Rivas-Villegas</u>, 142 S. Ct. at 8 (citation and internal quotation marks omitted).  The inquiry is ordinarily made by "compar[ing] the factual circumstances faced by the defendant to the factual circumstances of prior cases to determine whether the decisions in the earlier cases would have made clear to the defendant that

8

his conduct violated the law." Sandoval v. Cnty. of San Diego,

985 F.3d 657, 674 (9th Cir. 2021).

Defendants argue that, on December 20, 2022, it was not clearly established that officers' warrantless entry into a home in response to a 911 call reporting physical abuse of a child therein violates the Fourth Amendment. (Mot. at 8-9.)[6] They also argue that the Ninth Circuit has recognized that such a scenario may fall within the exigency exception to the Fourth Amendment's warrant requirement, showing that the unconstitutionality of their alleged conduct was not clearly established. (Id. at 9 (citing Jeffries v. Las Vegas Metro. Police Dep't, 713 F. App'x 549 (9th Cir. 2017); United States v. Martinez, 406 F.3d 1160, 1164 (9th Cir. 2005)).)

Plaintiffs argue that because neither of the Ninth Circuit decisions defendants cite addressed qualified immunity, they are irrelevant to whether the law at issue was clearly established. (See Opp. at 16-17.) This misunderstands the

---

[6] The First Amended Complaint alleges that these defendants "purposefully failed to seek and/or obtain a warrant, knowing that insufficient grounds or evidence existed to support such application." (FAC at ¶ 74.) However, it also alleges that their entry into plaintiffs' home was in response to a 911 call by B.T. "ask[ing] whether grabbing a child by the neck was child abuse." (Id. at ¶ 35.)

At oral argument, counsel for plaintiff noted that the First Amended Complaint alleges the 911 call was framed as a question, rather than as an explicit accusation of abuse. On this basis, he contended that the court cannot conclude, based on that allegation, that defendants had reason to believe abuse actually occurred. Even viewing the allegations in the light most favorable to plaintiffs, however, the court cannot agree. A question as to the lawfulness of conduct as specific as was referenced here -- "grabbing a child by the neck" -- clearly gives rise to an inference that such conduct occurred.

qualified immunity analysis, however, as the question is whether existing precedent would have made clear to a reasonable officer that their conduct was unconstitutional, not whether previous cases had themselves proscribed or allowed such conduct on qualified immunity grounds.  See Pearson, 555 U.S. at 231; Sandoval, 985 F.3d at 674.  Likewise, although plaintiffs argue in their opposition, and maintained at oral argument, that the warrant requirement for entries of the home was clearly established by the text of the Fourth Amendment and precedent interpreting it, (see Opp. at 16), this frames the right at too high a level of generality.  See Kisela, 138 S. Ct. at 1152. Rather, "the clearly established law must be 'particularized' to the facts of the case."  White v. Pauly, 137 S. Ct. 548, 552 (2017) (quoting Anderson v. Creighton, 483 U.S. 635, 640 (1987)).

When asked at oral argument for the case which would most clearly establish the unlawfulness of defendants' alleged warrantless entry into plaintiffs' home on December 20, 2020, counsel for plaintiffs cited the court to Bonivert v. City of Clarkston, 883 F.3d 865 (9th Cir. 2018), which plaintiffs also cite in their opposition brief.  (See Opp. at 16.)  Bonivert, however, involved circumstances meaningfully different from those alleged here.  There, officers broke the plaintiff's window to force their way into his home, without a warrant, after the plaintiff had repeatedly and physically denied them access.  883 F.3d at 870-71, 875.  By the time the officers arrived, the victims of the alleged domestic disturbance "had safely departed the home," establishing that they were in no danger.  See id. at 868.  Here, although plaintiffs allege O'Neel's husband

10

"protested" when defendants entered their home, they do not allege defendants used force to gain entry. (See FAC at ¶¶ 34-37.)  More significantly, based on plaintiffs' allegations that defendants came because of a 911 call asking if "grabbing a child by the neck was child abuse," the First Amended Complaint gives no indication that defendants were aware that any victims or potential victims of domestic violence were no longer in the home at the time they arrived. (See id.)

Moreover, Bonivert reaffirmed that the emergency exception to the warrant requirement applies where "police respon[ding] to reports of domestic violence" have "an objectively reasonable basis for believing" that warrantless entry is necessary "to render emergency assistance to an injured occupant or to protect an occupant from imminent injury."  883 F.3d at 876-77 (quoting Brigham City v. Stuart, 547 U.S. 398, 403 (2006)); see id. at 874 ("No question has been raised, or reasonably could be, about the authority of the police to enter a dwelling to protect a resident from domestic violence.") (quoting Georgia v. Randolph, 547 U.S. 103, 118 (2006)).  It also noted that the exigency exception may apply when officers respond to reports of domestic violence and "the . . . victim is still in the home."  Id. at 878 (quoting United States v. Martinez, 406 F.3d 1160, 1164 (9th Cir. 2005)).  Thus, if anything, Bonivert suggests that Heichlinger, Austin, and Husar's conduct here, as alleged in the First Amended Complaint, was in fact lawful.  It does not clearly establish the unconstitutionality of defendants' alleged conduct here.

Plaintiffs have thus not identified, nor is the court

1  aware of, any precedent that existed as of December 20, 2020

2  clearly establishing that a warrantless entry into the home in

3  response to a 911 call alleging physical abuse of a child

4  violates the Fourth Amendment.  Accordingly, the court will grant

5  qualified immunity to defendants Heichlinger, Austin, and Husar

6  as to plaintiffs' claim alleging unlawful entry on December 20,

7  2020.

8        B.   Claims Based on December 22 Entry and Removal

9             1.   Procedural Due Process Claim

10             Defendants also challenge plaintiffs' procedural due

11  process claim, which challenges defendants' alleged unlawful

12  removal of the children, contending that plaintiffs have failed

13  to identify a protected liberty interest of which they were

14  deprived, as is necessary to state such a claim.  (Mot. at 6.)

15  However, in the First Amended Complaint, plaintiffs allege they

16  were unlawfully deprived of "[t]he right to familial

17  association," (FAC at ¶¶ 57-58), and the Ninth Circuit has

18  recognized that this right "is a fundamental liberty interest,"

19  Keates v. Koile, 883 F.3d 1228, 1236 (9th Cir. 2018) (citations

20  omitted); see also Troxel v. Granville, 530 U.S. 57, 65 (2000)

21  (plurality opinion) ("[T]he interest of parents in the care,

22  custody, and control of their children [ ] is perhaps the oldest

23  of the fundamental liberty interests recognized by this Court.");

24  Santosky v. Kramer, 455 U.S. 745, 753 (1983) (noting the "Court's

25  historical recognition that freedom of personal choice in matters

26  of family life is a fundamental liberty interest protected by the

27  Fourteenth Amendment").  Accordingly, the court rejects this

28  asserted basis for dismissal of plaintiffs' procedural due

12

1   process claim.

2          Defendants also argue, however, that the children

3   cannot maintain a procedural due process claim based on their

4   allegedly unlawful separation from O'Neel.  (Mot. at 6.)  They

5   point to the Ninth Circuit's statement that federal courts

6   "evaluate the claims of children who are taken into state custody

7   under the Fourth Amendment right to be free from unreasonable

8   seizures rather than the Fourteenth Amendment right to familial

9   association."  Keates, 883 F.3d at 1236 (citation omitted).

10  Plaintiffs do not address this argument, even though in their

11  opposition they reiterate their intent to maintain "a procedural

12  due process claim for the warrantless seizure of the children

13  that arises under the Fourteenth Amendment and applies to all

14  Plaintiffs."  (Opp. at 15 n.2 (Docket No. 24).)

15         The Ninth Circuit has repeatedly made clear, however,

16  that although "parents 'have a well-elaborated constitutional

17  right to live' with their children that 'is an essential liberty

18  interest protected by the Fourteenth Amendment[ ],'" children

19  must bring claims challenging the failure of "government

20  officials . . . to obtain prior judicial authorization before

21  removing a child from the custody of their parent" under the

22  Fourth Amendment.  Kirkpatrick v. Cnty. of Washoe, 843 F.3d 784,

23  789-90 (9th Cir. 2016) (en banc) (quoting Wallis v. Spencer, 202

24  F.3d 1126, 1136 (9th Cir. 1999)); see id. (noting complaint

25  alleged defendants deprived child of both "the right to be free

26  from unreasonable searches and seizures" and "the right to be

27  with her parents," and analyzing both under the Fourth

28  Amendment).  Because plaintiffs identify no contrary authority

1  establishing that B.T., A.O., D.O., and A.T. may maintain a

2  procedural due process claim separate and apart from their Fourth

3  Amendment claim, those plaintiffs' procedural due process claims

4  will be dismissed.

5        C.   <u>Fourth Amendment Claim</u>

6            Defendants next argue that plaintiffs' first claim for

7  relief asserts a Fourth Amendment claim on behalf of O'Neel that

8  cannot be supported because plaintiffs have not alleged O'Neel

9  was personally subjected to any unlawful seizure.  (Mot. at 7.)

10 As the First Amended Complaint indicates, however, and as

11 plaintiffs make clear in their opposition, the challenged

12 allegations do not include a Fourth Amendment claim on behalf of

13 O'Neel.  (<u>See</u> FAC at ¶¶ 57-63 (alleging a Fourth Amendment

14 violation only as to the children); Opp. at 15 & n.2.)  Because

15 the First Amended Complaint does not include the claim defendants

16 challenge, the court cannot dismiss it.

17       D.   <u>Seizure of Children</u>

18           Plaintiffs' first and fourth claims are asserted

19 against several defendants, including defendants Wright,

20 Heichlinger, Austin, and Husar.  (FAC at 12, 20-21.)  Defendants

21 argue these claims should be dismissed as against these four

22 defendants because, although in these claims plaintiffs allege

23 these defendants both violated plaintiffs' procedural due process

24 rights and falsely imprisoned them in the course of removing

25 B.T., A.O., D.O., and A.T. from their home and from O'Neel, (<u>see</u>

26 <u>id.</u> at ¶¶ 61, 97), the First Amended Complaint does not actually

27 allege these defendants were present during or participated in

28 the removal of the children.  (Mot. at 7.)

1    Plaintiffs do not address this argument in their

2    opposition, and defendants appear for the most part to be

3    correct.  The factual allegations in the First Amended Complaint

4    state that defendants Heichlinger, Austin, and Husar entered

5    plaintiffs' home to perform a welfare check on December 20, 2022,

6    and that defendants Catano, Wright, and Does 1 through 4 came on

7    December 22, 2022 and participated in the removal of the

8    children.  (See FAC at ¶¶ 29-38, 42-49.)  The First Amended

9    complaint does not allege that there was any overlap between the

10   officers present on December 20 and those present on December 22.

11   (See id.)  Accordingly, plaintiffs fail to allege facts

12   indicating that defendants Heichlinger, Austin, and Husar

13   participated in the removal of B.T., A.O., D.O., and A.T. on

14   December 22.  See Taylor v. List, 880 F.2d 1040, 1045 (9th Cir.

15   1989) ("Liability under section 1983 arises only upon a showing

16   of personal participation by the defendant."); Sprewell, 266 F.3d

17   at 988.  But as noted, the First Amended Complaint does allege

18   that defendant Wright was present on December 22 and participated

19   in the removal of the children.  Accordingly, the court will

20   dismiss plaintiffs' Count One and Four claims as to defendants

21   Heichlinger, Austin, and Husar, but not as to defendant Wright.

22           E.   Municipal Liability Claim

23   Defendants also seek dismissal of plaintiffs' claim for

24   municipal liability as against the City.[7]  (Mot. at 9.)  To state

25   a § 1983 claim against a municipality, a plaintiff must allege

26   

27         [7]   Plaintiffs also assert a municipal liability claim
     against defendant County of Sacramento, which is not a party to
28   the instant motion.

15

"(1) that he possessed a constitutional right of which he was deprived; (2) that the municipality had a policy; (3) that this policy 'amounts to deliberate indifference' to the plaintiff's constitutional right; and (4) that the policy is the 'moving force behind the constitutional violation.'" Oviatt ex rel. Waugh v. Pearce, 954 F.2d 1470, 1474 (9th Cir. 1992) (quoting City of Canton v. Harris, 489 U.S. 378, 389-91 (1989)).  The existence of such a "policy" may be shown through a variety of means, including by (1) "prov[ing] the existence of a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law," City of St. Louis v. Praprotnik, 485 U.S. 112, 127 (1988) (plurality opinion) (citation and internal quotation marks omitted), and (2) demonstrating that the municipality failed to adequately train employees so as to avoid the constitutional violations that occurred, see Harris, 489 U.S. at 388.

Plaintiffs argue the existence of an unlawful policy is adequately pled because the First Amended Complaint alleges the City had a "long standing practice and custom" of removing children from their parents without performing a reasonable investigation and without cause to believe the children were in such imminent danger as to justify a failure to obtain a warrant for seizure of the children.  (FAC at ¶ 86.)  They similarly allege the City had a longstanding practice and custom of removing all children from a home after determining that any child there is at risk, without performing an individualized investigation into whether the other children are also

1   sufficiently at risk to justify removal.  (Id. at ¶ 88.)   In

2   support of these alleged practices and customs, plaintiffs

3   identify seven cases brought in this court or in state court that

4   they contend involved the unlawful removal of children under

5   circumstances similar to those alleged here.  (Id. at ¶ 90.)

6        Each of these cases, however, appears to involve claims

7   against the County of Sacramento, rather than against the City of

8   Folsom, (id.), a point that plaintiffs do not dispute (see Opp.

9   at 17-20) and that plaintiffs' counsel conceded at oral argument.

10  Accordingly, these cases do not create a plausible inference that

11  the City maintains the alleged practices and customs plaintiffs

12  identify, because plaintiffs' citation of them does not amount to

13  an allegation that the City has previously operated under the

14  alleged practices and customs, as would be necessary to make them

15  "long standing."  See Hyun Ju Park v. City & Cnty. of Honolulu,

16  952 F.3d 1136, 1142 (9th Cir. 2020) (to state a claim for

17  municipal liability based on custom or practice, plaintiff "must

18  ordinarily point to a pattern of prior, similar violations of

19  federally protected rights"); Perryman v. City of Pittsburg, 545

20  F. Supp. 3d 796, 800-01 (N.D. Cal. 2021) (considering prior

21  incidents in deciding whether municipal liability claim

22  adequately identified unlawful practice or custom); Hughey v.

23  Drummond, 2:14-cv-00037 TLN AC, 2017 WL 590265, at *6 (E.D. Cal.

24  Feb. 14, 2017) (same); Bagley v. City of Sunnyvale, 16-cv-02250

25  LHK, 2017 WL 344998, at *15 (N.D. Cal. Jan. 24, 2017) (dismissing

26  municipal liability claim because plaintiff failed to "allege any

27  facts that indicate that the [city's] police force is regularly

28  taking actions involving excessive force or unlawful arrests" and

1    instead "only [pled] actions related to his own arrest and

2    prosecution").

3           Plaintiffs also contend the First Amended Complaint

4    states a claim for municipal liability based on a failure-to-

5    train theory.  (Opp. at 19.)  It alleges:

6           Based on the duties charged to City of Folsom . . .
            related to the nature of work (child abuse
7           investigations) which is a usual and recurring
            situation with which [its] employees are engaged, the
8           failure to adequately train [its] employees evinced by
            the conduct of removing Plaintiff Faun O'[N]eel's
9           children as factually alleged in this case . . .
            make[s] it reasonable to believe -- and plaintiffs
10          allege -- that the . . . [City is] deliberately
            indifferent to the constitutional rights of familial
11          association enjoyed by parents and children . . . and
            that [its] failure to provide adequate training of
12          employees such as the individually named Defendants
            herein was the moving force behind the removal of the
13          minor children in this suit and the constitutional
            violations related thereto . . . .
14

15   (FAC at ¶ 82.)  More specifically, plaintiffs allege the City

16   fails to train officers as to "the full considerations that . . .

17   law enforcement personnel must evaluate and the standards that

18   must be met . . . for the removal or separation of a child from

19   his or her parents to be lawful under the U.S. Constitution . . .

20   and the circumstances that can make removal of a child both

21   'truly exigent' and done without violating a famil[y's] rights."

22   (Id. at ¶ 83.)  They further allege the City takes no measures

23   "to 'audit' the efficacy of the trainings [it] do[es] provide

24   employees," such that the City renders itself incapable of

25   knowing "whether or not the employees are . . . actually

26   understanding or comprehending the gravamen" of any training the

27   City does provide.  (See id. at ¶ 84.)

28          The court agrees that the First Amended Complaint

                                    18

1   adequately states a claim for municipal liability based on a

2   failure to train.  Based on plaintiffs' allegations, at least at

3   the pleading stage, this appears to be one of those rare cases in

4   which, "in light of the duties assigned to specific officers or

5   employees[,] the need for more or different training is so

6   obvious, and the inadequacy so likely to result in the violation

7   of constitutional rights, that the policymakers of the city can

8   reasonably be said to have been deliberately indifferent to the

9   need." Harris, 489 U.S. at 390.  Specifically, the need for a

10  municipality to provide adequate training regarding the Fourth

11  Amendment requirement to obtain a warrant when removing children

12  from their home, and regarding the exceptions thereto, should be

13  obvious to any municipality that maintains a police department,

14  as officers may sometimes come to believe such removal is

15  permitted for the children's protection.

16          Here, plaintiffs plausibly allege that defendants

17  Heichlinger, Austin, and Husar came to their home and interviewed

18  the children on December 20, 2022, and that defendants Catanio

19  and Wright -- officers of the same police department as

20  Heichlinger, Austin, and Husar -- returned two days later, with

21  no warrant, to remove all four children.  (See FAC at ¶¶ 34-43.)

22  Although plaintiffs also allege that Catanio and Wright

23  interviewed the children later during their visit on December 22,

24  they allege that upon arrival, these officers informed O'Neel

25  that they had come to take the children.  (Id. at ¶¶ 42-44, 47.)

26  Thus, viewing the allegations in the light most favorable to

27  plaintiffs, the December 22 interviews did not form the basis of

28  the decision to remove the children without a warrant.  Rather,

the allegations indicate that Catanio and Wright came to plaintiffs' home on December 22 for the specific purpose of seizing the children, based solely on what defendants had learned on December 20, and without any subsequent contact with O'Neel or the children.  They allegedly did so without having obtained a warrant during the intervening two-day period, even though such a period would have been ample time to obtain one.

These allegations give rise to a plausible inference that the City failed to adequately train its officers on the requirement that they obtain a warrant prior to removing children from their homes and on the limited applicability of exceptions to that requirement, including that to constitute a valid exception, any emergency or exigency must afford officers insufficient time to obtain a warrant.  See Kirkpatrick v. Cnty. of Washoe, 843 F.3d 784, 792 (9th Cir. 2016) (en banc) ("[I]t [i]s well-settled that a child c[an]not be removed without prior judicial authorization absent evidence that the child [i]s in imminent danger of serious bodily injury.").  Because "[C]ity policymakers know to a moral certainty that their police officers will be required" to address domestic violence, including by separating abused children from abusive parents, and because the City has vested its officers with the authority to effectuate such separations, the need to adequately train officers "in the constitutional limitations on [such conduct] can be said to be 'so obvious,' that failure to do so" could give rise to municipal liability if plaintiffs' allegations are proven true.  Harris, 489 U.S. at 390 n.10.

This conclusion finds strong support in the Ninth

1  Circuit's decision in Kirkpatrick v. County of Washoe.   There, in

2  reviewing a grant of summary judgment, the court concluded that

3  "evidence that [defendant officials] violated [the minor

4  plaintiff's] Fourth Amendment rights" by removing him without a

5  warrant, "in conjunction with . . . testimony that the County had

6  no policy of obtaining warrants before removing children from

7  parental custody and that it was [officials]' regular practice to

8  remove children regardless of the risk of imminent bodily

9  harm, raises more than a spectre of deliberate indifference by

10  [the] County."   843 F.3d at 796.

11       Kirkpatrick was "therefore a case in which the

12  municipality's 'inadequacy [was] so likely to result in the

13  violation of constitutional rights' that a jury could reasonably

14  find § 1983 liability without needing a pattern of violations to

15  find the County culpable."   Id. (quoting Harris, 489 U.S. at

16  390).   "Given the work performed by [the defendant officials],"

17  the court reasoned, "the need for [the County] to train its

18  employees on the constitutional limitations of separating parents

19  and children [wa]s 'so obvious' that its failure to do so [wa]s

20  'properly characterized as deliberate indifference to the

21  constitutional rights' of . . . County families."   Id. (quoting

22  Harris, 489 U.S. at 390 & n.10) (alterations adopted).

23       According to the First Amended Complaint, Catanio and

24  Wright came to plaintiffs' home after three other officers had

25  come to interview the children two days earlier, giving rise to a

26  plausible inference that the visits and removal were to at least

27  some degree collaborated upon within the police department.   The

28  failure of the officers to obtain a warrant for the removal of

the children despite this collaboration plausibly suggests that responsibility for this failure rests at a higher level than that of the individual defendants in this case.  Based on plaintiffs' allegations, and drawing all permissible inferences in their favor, the court concludes the First Amended Complaint states a claim for municipal liability, and the motion will be denied as to this claim.

           F.   Intentional Infliction of Emotional Distress Claim

           Finally, defendants seek dismissal of plaintiffs' fifth claim, alleging intentional infliction of emotional distress.  To state such a claim, "a plaintiff must show: (1) outrageous conduct by the defendant; (2) the defendant's intention of causing or reckless disregard of the probability of causing emotional distress; (3) the plaintiff's suffering severe . . . emotional distress; and (4) actual and proximate causation."  Huntingdon Life Scis., Inc. v. Stop Huntingdon Animal Cruelty USA, Inc., 129 Cal. App. 4th 1228, 1259 (4th Dist. 2005).

           Plaintiffs adequately plead these elements.  They allege that defendants, by virtue of the alleged warrantless removal of B.T., A.O., D.O., and A.T. from their mother and home on December 22, 2020, acted outrageously and "with reckless disregard for the possibility of [causing] severe emotional distress to Plaintiffs," in fact caused plaintiffs to suffer severe emotional distress due to the separation, and actually and proximately caused the distress by personally effectuating the removal.  (FAC at ¶¶ 104-09.)

           This claim, however, suffers from the same flaw as with plaintiffs' other claims challenging defendants' alleged conduct

during the December 22 visit to plaintiffs' home, in that it asserts liability against defendants Heichlinger, Austin, and Husar even though the First Amended Complaint includes no factual allegations stating that these defendants were in fact present on that date.  (See FAC at ¶¶ 42-49, 104-09.)[8]  Accordingly, plaintiffs' intentional infliction of emotional distress claim will be dismissed as against defendants Heichlinger, Austin, and Husar.

IT IS THEREFORE ORDERED that defendants' Motion for Judgment on the Pleadings (Docket No. 23-1), construed as a motion to dismiss, be, and the same hereby is, GRANTED IN PART and DENIED IN PART as follows:

- Plaintiffs B.T., A.O., D.O., and A.T.'s Count One claim, to the extent that it alleges violation of these plaintiffs' procedural due process rights under the Fourteenth Amendment, is DISMISSED;

- All plaintiffs' Count One, Count Two, Count Four, and Count Five claims are DISMISSED as to defendants Heichlinger, Austin, and Husar;

- Defendants' motion is DENIED in all other respects. Plaintiffs have twenty days from the date of this Order to file a second amended complaint, if they can do so consistent with this Order.

---

[8]   Although in their motion defendants also contend that Heichlinger, Austin, and Husar's alleged conduct on December 20, 2022 is not "outrageous" as a matter of law, the First Amended Complaint specifies that plaintiffs' claim for intentional infliction of emotional distress is based on the alleged removal of the children on December 22, 2022.  (See id. at ¶ 104.)

Dated:   July 15, 2022

WILLIAM B. SHUBB
UNITED STATES DISTRICT JUDGE