Robert R. Powell (SBN: 159747)
POWELL & ASSOCIATES
925 W. Hedding St.
San Jose, CA 95126
Phone: (408) 553-0201
Fax: (408) 553-0203
Email: rpowell@rrpassociates.com

Samuel H. Park (SBN: 261136)
LAW OFFICE OF SAMUEL H. PARK, APC
374d Bergin Drive
Monterey, CA 93940
Phone: (831) 529-5955
Email: sam@sampark.lawyer

Attorneys for All Plaintiffs.

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FAUN O'NEEL, et al. | Case No. 2:21-cv-02403-WBS-DB |
| Plaintiffs, | **STIPULATION AND ORDER GRANTING LEAVE TO PLAINTIFFS' FILING OF THIRD AMENDED COMPLAINT** |
| v. | |
| CITY OF FOLSOM, et al. | |
| Defendants. | Magistrate Judge: Hon. Deborah Barnes<br>Courtroom: 27, 8th Floor |

## **STIPULATION**

This STIPULATION ("Stipulation") is made and entered into by and between all parties, through counsel, as follows:

### **Recitals**

WHEREAS, the parties have met and conferred regarding Plaintiffs filing of a 3rd Amended Complaint in this matter upon stipulation of the parties, agreeing with Plaintiffs intended request to seek leave to file a Third Amended Complaint for Civil Rights Violation, and,

WHEREAS, the Defendants do not by their stipulation waive any objections, grounds to dismiss or strike all or a portion of the 3rd Amended Complaint, or such other pleadings as they deem necessary related to the Third

Amended Complaint For Civil Rights Violation,

The parties therefore stipulate and agree and ask the Court order same as follows;

1.  The Plaintiffs be granted leave to file the Third Amended Complaint For Civil Rights Violation, a copy of which is attached hereto as Exhibit A.

**IT IS SO STIPULATED.**

Date: 8/29/23       —       /S/ Robert R. Powell
ROBERT POWELL, ESQ.
Attorney for Plaintiffs

Date: 8/29/23       /S/ Jonathan B. Paul
JONATHAN B. PAUL, ESQ.
Attorneys for County of Sacramento

Date: 8/30/23       /S/ John R. Whitefleet
JOHN R. WHITEFLEET, ESQ.
Attorney for City of Folsom

## ATTESTATION OF ELECTRONIC SIGNATURE

I, Robert Powell, attest that all other signatories listed hereto, and on whose behalf this filing is submitted, concur in the content of this Stipulation and have authorized the filing.

Date: 8/30/23       —       /S/ Robert R. Powell
ROBERT POWELL, ESQ.
Attorney for Plaintiffs

//
//
//
//

1

**ORDER**

Based on the party's submission of a Stipulation And [Proposed] Order Granting Leave To Plaintiffs' Filing Of Third Amended Complaint on or about August 30th, 2023, the Court does hereby approve of the requested stipulation and thereon makes the following orders;

1. The Plaintiffs are granted leave to file their Third Amended Complaint For Civil Rights Violation, a copy of which is attached hereto as Exhibit A, and shall do so in a timely manner upon receipt of this Order.

**IT IS SO ORDERED.**

Dated:  August 31, 2023

WILLIAM B. SHUBB
UNITED STATES DISTRICT JUDGE

**EXHIBIT A**

Robert R. Powell (SBN: 159747)
Powell & Associates
925 W. Hedding St.
San Jose, CA 95126
Phone: (408) 553-0201
Fax: (408) 553-0203
Email: rpowell@rrpassociates.com

Samuel H. Park (SBN: 261136)
Law Office of Samuel H. Park, APC
374d Bergin Drive
Monterey, CA 93940
Phone: (831) 529-5955
Email: sam@sampark.lawyer

Attorneys for Plaintiffs.

## UNITED STATES DISTRICT COURT

## EASTERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| FAUN O'NEEL, individually and as Guardian Ad Litem for her children B.T., A.O., D.O., and A.T. | Case No. 2:21-cv-02403-WBS-DB |
| Plaintiffs, | **THIRD AMENDED COMPLAINT FOR CIVIL RIGHTS VIOLATION** |
| v. | [JURY TRIAL DEMANDED] |
| CITY OF FOLSOM, a public entity; SPENSER HEICHLINGER, an individual; MELANIE CATANIO, an individual; LOU WRIGHT, an individual; DOE CITY OF FOLSOM DEFENDANTS, individuals; KERYN STARKS, an individual; SASHA SMITH, an individual; COUNTY OF SACRAMENTO, a public entity; DOE DCFAS DEFENDANTS, individuals; and DOES 1 through 10, inclusive, | |
| Defendants. | |

- 1 -

## **PARTIES**

1.    Plaintiff FAUN O'NEEL ("Faun" or "Plaintiff") is an individual residing in the County of Sacramento. Faun is the mother of minor Plaintiffs, B.T., A.O., D.O., and A.T. (The true names of the minors are replaced with the initials to protect their privacy.)

2.    At or near the time of the filing of this Complaint Faun O'Neel has or will file a request for appointment as Guardian Ad Litem for her minor children B.T., A.O., D.O., and A.T.

3.    Plaintiff B.T. is and was at all times relevant an individual residing in the County of Sacramento, California. B.T. is Faun's daughter. At the time of the events alleged herein, B.T. was fourteen (14) years old.

4.    Plaintiff A.O. is and was at all times relevant an individual residing in the County of Sacramento, California. A.O. is Faun's daughter. At the time of the events alleged herein, A.O. was fourteen (14) years old.

5.    Plaintiff D.O. is and was at all times relevant an individual residing in the County of Sacramento, California. D.O. is Faun's son. At the time of the events alleged herein, D.O. was twelve (12) years old.

6.    Plaintiff A.T. is and was at all times relevant an individual residing in the County of Sacramento, California. A.T. is Faun's daughter. At the time of the events alleged herein, A.T. was ten (10) years old.

7.    Defendant CITY OF FOLSOM ("CITY") is a public entity. The Folsom Police Department is an administrative subdivision of CITY, responsible for enforcement of the law within the jurisdiction of the CITY.

8.    Defendant MELANIE CATANIO ("CATANIO") is an individual who on information and belief was at all times relevant a resident of the County of Sacramento and an officer, agent, and/or employee of CITY, working as a police officer for the Folsom Police Department. CATANIO is sued in her individual capacity as an employee of CITY.

9.    Defendant LOU WRIGHT ("WRIGHT") is an individual who on information and belief was at all times relevant a resident of the County of Sacramento and an officer, agent, and/or employee of CITY, working as a police officer for the Folsom Police Department. WRIGHT is sued in his individual capacity as an employee of CITY.

10.   Other CITY police officers mentioned herein, but not Defendants at this time, are officers HEICHLINGER, AUSTIN, and HUSAR.

11.   Defendants DOE CITY DEFENDANTS are individuals who on information and belief were at all times relevant residents of the County of Sacramento and officers, agents, and/or employees of CITY, working as police officers for the Folsom Police Department. Each of the DOE CITY DEFENDANTS are sued in their individual capacity as an employee of CITY. Plaintiffs are ignorant of the names of the DOE CITY DEFENDANTS. Plaintiffs reserve the right to amend this complaint at such time as the identities of these defendants are ascertained.

12.   Defendant COUNTY OF SACRAMENTO ("COUNTY") is a public entity. The Department of Child, Family and Adult Services ("DCFAS") is administrative subdivision of COUNTY responsible for discharging the COUNTY's child welfare programs and delivering Child Welfare Services to residents within the territorial jurisdiction of the COUNTY.

13.   Defendant KERYN STARKS ("STARKES") is an individual who on information and belief was at all times relevant a resident of the County of Sacramento and an officer, agent, and/or employee of COUNTY, working as a social worker for DCFAS. STARKES is sued in her individual capacity as an employee of COUNTY.

14.   Defendant SASHA SMITH ("SMITH") is an individual who on information and belief was at all times relevant a resident of the County of Sacramento and an officer, agent, and/or employee of COUNTY, working as

a social worker for DCFAS. SMITH is sued in her individual capacity as an employee of COUNTY.

15.   Defendants DOE COUNTY DEFENDANTS were at all times relevant individuals residing in the County of Sacramento and officers, agents, and/or employees of DCFAS. Plaintiffs are ignorant of the true names of the DOE COUNTY DEFENDANTS. Plaintiffs reserve the right to amend this complaint at such time as the true identities of said defendants are discovered.

16.   The true names and capacities, whether individual, corporate, associate or otherwise, of Defendants DOES 1 through 10, inclusive, are unknown to Plaintiff at the present time. Plaintiff therefore sues said Defendants by such fictitious names and will seek leave of Court to amend this Complaint to set forth the true names and capacities thereof, when the same has been ascertained.

17.   Defendants, and each of them, were and are the agents, servants, representatives, and/or employees of each of the other Defendants, herein, and were at all times acting within the course and scope of such agency, representation and employment and with the permission and consent of each of said Defendants.

18.   Plaintiffs are informed and believe, and upon such information and belief allege, that each of the Defendants, including DOES 1 through 10, inclusive, were at all times herein mentioned, acting in concert with, and in conspiracy with, each and every one of the remaining Defendants in doing the things alleged in this Complaint.

19.   Wherever appearing in this Complaint, each and every reference to Defendants, and to any of them, is intended to be and shall be a reference to all Defendants hereto, and to each of them, named and unnamed, including all fictitiously named Defendants, unless said reference is otherwise specifically qualified.

- 4 -

**JURISDICTION**

20.   Pursuant to 28 U.S.C. sections 1331, 1343(a)(3) and 1343(a)(4), the Court has original jurisdiction over the claims alleged herein arising under the Fourth, and Fourteenth Amendments to the United States Constitution.

21.   Pursuant to 28 U.S.C. section 1367(a), the Court also has supplemental jurisdiction over the remaining state law claims, which are so related to the vindication of constitutional rights that they form the same case or controversy.

22.   Plaintiff, Faun O'Neel, seeks to vindicate her liberty interest in the companionship, care, custody, and management of her children. Faun and her children, B.T., A.O, D.O, and A.T. have the constitutional right to live together without governmental interference. All Plaintiffs seek to vindicate their guaranteed right, under the Fourth, and Fourteenth Amendments to the United States Constitution, to not be separated without due process of law except in emergencies.

**VENUE**

23.   Venue is proper in this judicial district because all Defendants are residents of California and the events or omissions giving rise to Plaintiffs' claims occurred in the County of Sacramento, State of California.

**COMMON FACTS**

24.   Faun is the biological mother of daughters, B.T. and A.T. and the adoptive mother of A.O and D.O. Over the years, Faun fostered more than 20 children in her home, from newborns through age 12. She once garnered recognition from COUNTY's DFACS as "foster parent of the year."

25.   Faun fostered A.O. and D.O. for approximately 18 months, before she fell in love with them and formally adopted the children on December 21, 2011. A.O and D.O. are biological half-siblings.

26.   In 2013, Faun married Danny O'Neel ("Danny"), a U.S. Army Veteran. Danny became stepfather to all four children. At all times relevant to this Complaint, Faun, Danny, B.T., A.O., D.O, and A.T., formed a family unit, entitled to all the protection afforded under the United States Constitution and the laws of the State of California.

27.   Faun and Danny have always loved and nurtured their children. They also take their duty to raise conscientious, responsible, and civic minded children seriously. Each year, the O'Neel family adopts a family for Christmas, serves meals for the underprivileged on Thanksgiving, volunteer for suicide prevention services, and a variety of other projects designed to assist veterans and first responders. Faun, herself, is the Executive Director of Warfighter Overwatch, a non-profit geared towards assisting veterans of the United States Armed Services and has been a fellow of the Elizabeth Dole Foundation since 2015.

28.   B.T., A.O., D.O., and A.T. had thrived under Faun and Danny's care their entire lives while in these parents' care. Both B.T. and A.O. are/were members of a High School cheerleading team that Faun coaches. D.O. enjoyed playing golf and running cross country. Their youngest child, A.T., was born at just 23 weeks and already has had two open heart surgeries. Despite this initial rough start, the child was also flourishing.  All of this would change after the unlawful conduct of the CITY Defendants identified herein, and the unlawful conduct of the COUNTY Defendants identified herein.

29.   On December 20, 2020, the O'Neel family was relaxing at home in the lead up to Christmas. Faun and the children were enjoying one of their family traditions, which was to bake and decorate Christmas cookies.

30.    That evening, the family had dinner plans to celebrate the birthday of Travis Miller ("Uncle Travis"), a fellow veteran who lived in the O'Neel family home.

31.    Prior to leaving for dinner, Faun asked D.O. to put away the Christmas cookies so that the family dog, Liberty, would not get to them while the family was away at the restaurant. D.O. had extra chores that week because he had been caught plagiarizing a school assignment the week prior and caused several class disruptions.

32.    When the family returned home, Faun discovered that the cookies had not been put away as requested. The dog had eaten most of the cookies and created a mess in the kitchen.

33.    Faun called D.O. to clean up the mess in the kitchen, which now included D.O.'s leftovers from the restaurant that spilled out from the refrigerator due to the haphazard way that D.O. stored the food. Faun marched D.O. to the kitchen to show him the mess he created. After D.O. cleaned the kitchen, Faun sent him straight to his bedroom as a form of discipline.

34.    At approximately 9:00 p.m., a loud banging was heard at the front door of the family's home. When Danny opened the door, he was met by HEICHLINGER, AUSTIN, and HUSAR.

35.    HEICHLINGER, AUSTIN, and HUSAR informed Danny that a 911 call had been made and that the officers were there to carry out a welfare check on the children. The child, B.T., had apparently called the 911 hotline to ask whether grabbing a child by the neck was child abuse. Unbeknownst to Faun and Danny, D.O. had gone to B.T.'s room after cleaning the kitchen and lied that Faun picked him up by the neck and carried him to the kitchen.

36.    HEICHLINGER, AUSTIN, and HUSAR entered the home without Faun or Danny's consent and without a warrant. When Danny protested, the police

officers became hostile and told Danny that he needed to "sit down and behave."

37.   The police officers ordered Danny and Faun to wake the children up so that they could be interviewed. Each of the children were interviewed by the police officers outside of the presence of Danny and Faun. After concluding the interviews, the police officers took several photographs of D.O. There were no marks or bruises on D.O.

38.   After interviewing the children and Faun, the officers left the home. They did not interview the other residents of the home, including Uncle Travis and Travis's father who was visiting from out of state.

39.   None of the officers presented any paperwork, contact information, or other resources regarding what might happen next.  No one in the home was arrested or even given a citation of any kind.

40.   Plaintiffs are informed and believe and thereon allege that, on December 21st, 2020, HEICHLINGER, contacted Sacramento County DCFAS to cross report suspected child abuse, though his report of the incident, which CATANIO later reviewed before removing the children with Defendant WRIGHT on December 22nd, 2020, clearly stated there were no marks around D.O.'s neck and included in his report 5 pictures he had taken of D.O.'s face and neck area that supported that truth.

41.   Among other things, said officer reported CITY's police department received a call from B.T., that her brother D.O. told her that Faun put her hands on his neck and "picked him up by the throat with both hands" because he did not put the Christmas cookies away properly. Said officer reported that the officers spoke with Faun, who stated that she grabbed D.O. by the back of the neck – not around his throat - and made him clean up the food. HEICHLINGER also reported that nobody else in the family witnessed the incident, though A.O. reported that she "thought she heard choking noises."

42.   After the cross-report by HEICHLINGER, DCFAS workers performed a risk assessment and safety assessment using the state-wide Structured Decision Making (SDM) tool of the California Department of Social Services, which indicated that the referral should be "evaluated out" as it "[did] not meet criteria for abuse or neglect" based on the information received."

43.   "Evaluate out" in child welfare parlance means to close the matter, no response or investigation of a social worker is required.

44.   On December 22, 2020, two days after the initial contact, and without either any further investigation or any other incidents involving the children, CATANIO, WRIGHT, and DOE CITY DEFENDANTS 1-4 arrived at Plaintiffs' home. CATANIO informed Faun and her husband Danny at the front door, before ever entering the home, that they were there to seize all of the children and remove them.

45.   None of the Defendants who came to the home on December 22nd, 2020 presented a warrant or court order, authorizing the seizure of any of the children. At the time of the seizure, none of the children were in danger of suffering serious bodily injury or death within the time it would have taken Defendants to obtain a warrant, authorizing the seizure.

46.   In addition, no effort of any kind was made by CATANIO or WRIGHT to seek any less intrusive means to potentially protect the children from their unsubstantiated perception – apparently – that the children were at imminent risk of serious bodily injury.  Indeed, even though Faun suggested that her mother could take placement of the children and lived nearby, CATANIO did not so much as ask for the grandmother's name or address and told Faun that issue – placement with a relative – would be decided "later."

47.   As HEICHLINGER, AUSTIN, and HUSAR before them, CATANIO, WRIGHT, and DOE CITY DEFENDANTS 1-4 entered the home without obtaining Danny or Faun's consent and removed the children, including three

THIRD AMENDED COMPLAINT FOR CIVIL RIGHTS VIOLATION

1   children A.O., B.T., and A.T., for whom there were no current allegation of

2   abuse or neglect of any kind.

3   48.   Also, while at the front door, out of "nowhere," CATANIO accused

4   Faun of having had her children previously removed due to [D.O.]g abuse.

5   This assertion was as shocking as it was untrue and Faun told her so;

6   CATANIO charged on ahead with her plan to remove all of the children

7   simply saying that's what her records "show."

8   49.   Faun had never had any of her children removed from her home for any

9   reason in the past related to any claim of [D.O.]g or alcohol abuse.  She did

10  have one child whose placement was changed from her house, but the child

11  was suffering rather serious mental health issues with accompany

12  unacceptable behavior issues, which included fabricating claims against Faun.

13  and Faun asked that she be removed from her care.  Plaintiffs are informed

14  and believe, and thereon allege, that CATANIO intentionally made this

15  knowingly false accusation about prior removal of children due to Faun's

16  [D.O.]g abuse, in order to further terrorize Plaintiffs, particularly Faun.

17  50.   When CATANIO took the children back to the CITY police station

18  CATANIO interviewed B.T., A.O, D.O., and A.T.  During the interviews,

19  CATANIO, in an apparent effort to "relate" to the children, told the children

20  about trauma that she and her sibling had purportedly suffered during their

21  own childhood and stated that she was a victim of child abuse.

22  51.   CATANIO did not learn anything new before removing the children on

23  December 22, that suggested that Faun or Danny presented an imminent risk

24  of causing serious bodily injury to the children, and having done zero

25  "investigation" between the time CITY Defendants came to Faun's home on

26  December 20th, there could not have been further information known to

27  CATANIO or any of the officers who came to the home on December 22,

28  2020 that remotely constituted an articulable imminent risk of serious bodily

injury to any of the children such that there was insufficient time within which to obtain a warrant or explore lesser intrusive alternatives that did not entirely disrespect and violate the Plaintiffs rights of familial association pursuant to the 14th Amendment.

52.   Plaintiffs are informed and believe that CATANIO and/or WRIGHT also, on the way to CITY Police Department stopped to pick up food for the children at Chick-fil-A and during that time in the patrol car, also questioned the children, yet made no recording of any of those conversations.

53.   Plaintiffs affirmatively allege, due to obtaining audio-recordings, that CATANIO's interviews of the children at the police station were conducted in a wholly inappropriate manner in direct contravention of the breadth of knowledge regarding both the impropriety and ineffectiveness of suggestive and leading questioning of minor children.

54.   In the police station interviews CATANIO pressured the children to supply information against their parents in a manner highly suggestive of the responses that she sought. CATANIO knew that the children would undergo a separate forensic examination known in Sacramento County as a "SAFE" interview (an interview that is conducted by a trained forensic child abuse interviewer and audio-videotaped), and expressly stated she intended to conduct one in her police report about December 22nd, 2020.  Either due to a lack appropriate training or inappropriate practices, or an oversized crime-stoppers ego, CATANIO still interviewed the children for what would be the second or third time by the end of December 22nd, 2020, even though the very purpose of SAFE interviews is to avoid multiple interviews of young children both for purposes of avoiding taking them through multiple acts of questioning about what are believed to be traumatic events and circumstances.

55.   CATANIO knew or should have known that it is both emotionally damaging and highly improper to subject children to multiple interrogations

THIRD AMENDED COMPLAINT FOR CIVIL RIGHTS VIOLATION

and doing so can in fact undermine children's credibility as well as harm them emotionally, but did so anyway, indicating a lack of training or conduct, the moving force behind which was CITY practices or policies.

56.   By way of example as to just how bad these interviews were conducted by CATANIO, when interrogating the child, A.O., CATANIO misrepresented to the child what her other siblings had said or felt, projected her own (CATANIO's)  thoughts of how the children should feel, e.g. "it's scary to have to be home after that and feel the frustration or anger from mom and dad," and unbelievably, she relayed her own childhood experiences of abuse, all in an effort to coerce and pressure the child to give a version of the facts that CATANIO wanted.

57.   Throughout her entire interrogation of the children, CATANIO employed the use of leading questions to improperly put words in the mouths of the children or to suggest the responses that she desired.

58.   CATANIO went so far as to pressure and put fear into the children by outrageously suggesting that Faun could be responsible for causing the death of one or more of the children, if the children did not provide the answers she wanted:

> "I work these cases all the time, right? All it takes is for a reaction like that to go a little too far and then it's too late for [D.O.] And I don't want it to be too late for [D.O.] And I don't want it to be too late for you. I don't ever wanna have to have that call that we are sitting here today and we could have prevented that from happening. And that something goes on and you kids go back there and there's another reaction, but this time it went too far. Do you understand what I'm saying? Do you get where I'm coming from?"

59.   Within 20 minutes of the children's arrival at the Folsom Police Department, maternal grandmother, Fara Canutt, arrived to request that the children be placed in her care.  Upon seeing their grandmother at the police

station, children begged CATANIO for permission to go with their
grandmother.

60.   CATANIO refused to let the children even see or speak with their
grandmother and denied their request to leave with Fara, despite the fact
someone like Fara, a family member with a close bond with all of the children
for between most or all of their lives (the latter as to the O'Neel biological
children certainly) is exactly what complying with the "lesser intrusive
alternative" requirement under federal law means.

61.   Instead of determining whether it would be safe for the children to be
placed with their maternal grandmother, CATANIO, WRIGHT, and DOE
CITY DEFENDANTS 1 – 5 subjected Fara to an interrogation regarding
Faun's disciplinary practices. When Fara stated that she had not witnessed or
heard anything out of the ordinary with regard to the discipline of the children
and that none of the children had complained about any abuse or harsh
punishment, Defendants refused to allow her to take temporary custody of the
children or to even give them a hug. Instead, CATANIO and/or the other Doe
Defendants released the children to DCFAS personnel STARKES, and they
were placed in non-relative foster care.

62.   At the time the four children were placed in foster care, there were no
exigent circumstances, i.e. none of the children were in danger of suffering
severe bodily injury or death within the time it would have taken to obtain a
warrant. In addition, Defendants had no reasonable basis for refusing to place
the children with a ready, willing, and able grandparent of the children instead
of in foster care, a much less intrusive option than separating the children
from everyone and everything with which they were familiar.

63.   After seizing the four children, CATANIO contacted STARKES on
December 23rd, 2020 at approximately 10:55 a.m., and requested an
immediate response from DCFAS to assess for physical abuse.  At the time

CATANIO placed the call, she had no new information to provide, other than (1) that CATANIO had decided to seek an arrest warrant for Faun, (2) B.T. disclosed that D.O. Faun had pushed D.O. "about a year ago" and that D.O. needed to get stitches, and (3) that there was a police report from 2010, where Faun was accused of breaking her foster child's arm.

64.    Because the outcome of the SDM tool indicated that the report of suspected abuse should be "referred out," STARKES consulted with her supervisor Alycia Egli. STARKES and her supervisor decided to "upgrade" the referral to emergency response, overriding the outcome of the SDM tool.

65.    The SDM tool, is a statewide "tool" that is intended to provide some uniformity in the assessment of child abuse and/or neglect, so as to remove the wide vagaries of subjective interpretation of family history, ethnicity, family composition, and prior history of alleged abuse or neglect, to avoid the wildly disparate decision outcomes that had been happening for decades in California before implementation of the SDM tool use requirements.

66.    The SDM, which began state-wide use in 2005, is defined to the public as implementing "an approach to child protective services that uses clearly defined and consistently applied decision-making criteria for screening for investigation, determining response priority, identifying immediate threatened harm, and estimating the risk of future abuse and neglect."  Sadly, however, the SDM tools allow for an "override" and their success in avoiding wildly disparate outcome because of this feature is limited; this case is such an example.

67.    STARKES met with CATANIO, who provided STARKES a "protective custody report." Said report stated that all four children were "in present danger of ongoing physical abuse" because Faun had "strangled" D.O., among other things. At the time CATANIO made such report, she knew that there was no physical evidence of any kind that D.O. had been strangled.

68.   Also at that time, STARKES received a copy of CATANIO's police report and the prior report from 12/20/20 which clearly noted the lack of any physical evidence of strangulation and included photographs of D.O.'s neck which made it impossible for a reasonable person to conclude that D.O. had been "strangled" in any way whatsoever.  STARKES would later make the same observation herself of no injuries to D.O.'s face or neck.

69.   Based on her review of the report and her discussion with CATANIO, STARKES knew that insufficient grounds existed for seizing the children or keeping them in detention without a court order or parental consent. She knew, for example, that there was no physical evidence that D.O. was strangled by anyone and that D.O.'s story of being lifted by the neck and carried from his bedroom to the kitchen was implausible. STARKES also knew that there were no corroborating witnesses.

70.   Nevertheless, STARKES agreed with CATANIO that the children should be transported to DCFAS office, and that DCFAS would take custody of the O'Neel children.

71.   At the DCFAS office, STARKES interrogated each of the children without notifying Faun. This was now the third interview of the children before the "gold standard" process of the SAFE interviews intended to limit that very thing; multiple interviews of young children!

72.   When STARKES examined D.O., she noted in her own records of the interview that "[n]o evidence of abuse or neglect was observed on the child's neck or face." D.O. also denied having any injuries. The child also reported feeling safe at home and would not feel uncomfortable if he returned home. D.O. stated that Faun grabbed him by the back of the neck.

73.   STARKES never reported that D.O. felt safe in the care of Faun and Danny or that B.T. (the oldest) also said she felt D.O. was "safe" in the care of the parents in the warrant application she later wrote to accomplish yet

THIRD AMENDED COMPLAINT FOR CIVIL RIGHTS VIOLATION

another seizure of the children unlawfully by way of submitting a warrant application filled with falsehoods and riddled with omissions of exculpatory information she had in her possession at the time she prepared the warrant application, nor did she advise the Court of these facts in the Detention Report she subsequently authored.

74.   All of the other children reported to STARKES, as they did to every CITY police officer they had spoken to by that time, that they did not witness any physical altercation between Faun and D.O.

75.   The following day, on December 23, 2020, STARKES spoke with Faun by telephone. Faun denied carrying or pushing D.O. into the kitchen by the neck. She denied that she ever had a [D.O.]g problem or tested positive for [D.O.]g or alcohol problems.

76.   On December 24, 2020, the children were released to maternal grandmother, Fara Canutt, with a "safety plan," signed by STARKES, Faun, Danny, and Ms. Canutt. According to the plan, Faun and her husband would vacate the family home so that the children could return there and stay in the care of Ms. Canutt. The plan also provided that all contact between Faun and her children would be supervised by Ms. Canutt and that certain topics of discussion would be forbidden between the children and Faun/Danny.

77.   Faun and Danny followed every requirement of the Safety Plan at all times.

78.   On December 30, 2020, D.O. and A.T. each underwent a S.A.F.E. center interview. D.O. admitted that he lied about Faun choking him. D.O. also mentioned that his parents disciplined him because he had a habit of lying. A.T. also disclosed that Faun did not choke and carry D.O. to the kitchen. A.T. said that she witnessed D.O. "walking" from his room to the kitchen. The other children also mentioned the issue of D.O. lying, a credibility issue

as to D.O. that never made it into STARKES subsequent warrant application, W&IC 300 Petition or Detention Report.

79.   On January 8, 2021, STARKES submitted an application in support of an application for a protective custody warrant to the Juvenile Court ("warrant application").  STARKES knew that the juvenile court would review and rely upon the representations contained in her application in issuing or denying her application, so did SMITH. STARKES signed the application under penalty of perjury after SMITH reviewed the application and approved it for filing, though never herself checking any of the source information both used – and withheld – by STARKES in the warrant application.

80.   Despite her obligation to tell the complete truth, in her warrant application, STARKES intentionally made numerous false representations and concealed material exculpatory information from the Court.

81.   Despite her obligation to tell the complete truth, in her warrant application, STARKES intentionally made numerous false representations and concealed material exculpatory information from the Court.

82.   Among other things, STARKES misrepresented that:

a.   The children are in imminent danger of physical or sexual abuse and there are no reasonable means by which the children can be protected without temporary removal from the physical custody of the parents or guardians."

b. "The children's physical environment poses an imminent threat to the children's health or safety and there are no reasonable means by which the children can be protected without temporary removal from the physical custody of the parents or guardians."

c. That a "safety plan was created, which included the parents not residing in the home with the children and only having supervised virtual visitations for one hour total every other day, except for a supervised visit at the

family home on Christmas day for four hours." The Safety Plan did not say anything at all about "only supervised visitations for on hour total every other day." There was no time limit whatsoever to the visits, only that grandmother supervises them. The Safety Plan did not say a single word about "virtual" visitation. Notably, the Safety Plan was not attached to the warrant application. It also was not attached to the Detention Report STARKES and SMITH authored and signed. The non-inclusion of the source documents was a long-standing practice of COUNTY social workers designed to allow their lies, misrepresentations, and omissions of exculpatory information to go undetected.

d. "The mother, maternal grandmother, and step-father are not following the safety plan that was established by allowing the parents continued contact with the children and also discussing the ongoing CPS and law enforcement investigations." As already noted, this was entirely false, and its falsity known to STARKES, or the representations made with reckless disregard for their truth or falsity. The parents told them of an upcoming interview; the children had been through at least three of them at that point. "Foreshadowing" an event again such as that, particularly for which you've received a brochure on the "process," is for young children literally a sign of great parenting. Doing so helps lower children's anxiety, and it certainly is not "coaching."

e. Before the SAFE interview on December 30th, 2020, Faun had informed STARKES of cognitive deficiencies suffered by A.T., and Faun had literally told CATANIO on the day of the removal (12/22/20) that A.T.'s cognitive deficiencies were related in particular to an orientation as to "time." Faun also gave DOMINIQUE SMITH (not a defendant), who was the social worker right at the timeframe of the removal because STARKES was on vacation, a copy of A.T.'s Individualized Education Plan, which

reflected the aforementioned cognitive disability of A.T.  However, the interviewer (Seeley) was selected and allowed to conduct the interview despite this knowledge as to A.T.'s issue, and she was not trained to provide forensic interviews for special needs children.  Neither the fact of A.T.'s cognitive issues, or being advised of them, or the fact the interviewer at the SAFE Center was not equipped to do forensic interviews of a child with A.T.'s disability, was included in the warrant application.

f.   "On January 6, 2021, Social Worker Dominique Smith, spoke with SAFE Center Interviewer, Kandyce Seely. Social Worker Seely stated that during the SAFE interview [A.T.] disclosed that on December 20, 2020, prior to law enforcement responding to the home, the parents conducted a family meeting. During the meeting, [D.O.] stated that the mother choked him and the mother attempted to correct him by saying that she grabbed him by the back of the neck because he was not listening." The family had no such meeting before the police came on 12/20/20, and STARKES knew that, for she was in possession of the police report – which she also did not attach to the warrant application, nor did she and SMITH attach it to the Detention Report – which expressly noted that B.T., the oldest child who called the police, was on the phone with the police the entire time – reporting that the police kept her on the phone until they arrived at the home; the police met all of the family per the report at the front door when they arrived and immediately separated the children.

g. "It is believed that the parents are doing in-person visitation daily, instead of the virtual visitation every other day as agreed upon."  As previously noted, there was absolutely no evidence of any agreed upon "virtual visitation" in the Safety Plan, thus no basis for that or the "every other day" claim.

h. "During the SAFE interview on December 30, 2020, [D.O.] mentioned a family meeting, which included the parents, that occurred the day before the SAFE interview.  He stated that they discussed the process of an interview." STARKES specifically omitted that D.O.'s reference to anything resembling a "discuss[ion] [about] "the process of an interview" – which was how STARKES characterized it – was, 1) the child saying, "grandma read us a brochure she got sent from here [the SAFE Center]," and, "my little sister [A.T.] would be getting interviewed and that we'd definitely be here for a couple of hours." D.O. added, "And that's really it." 2) and my parents, since they were allowed to visit, um, last night, they said, um, that, that everything was fine, and you're doing a big interview, good luck, we want to be able to see you tomorrow, and so, um, really just, we talked about that before they had left, and then that's when my grandma showed us the brochure."

83.    STARKES also omitted and concealed exculpatory information that she knew either cut against or completely obliterated the representations she made in the warrant application, including, but not limited to:

a.  The fact that there was no evidence, at all, in support of the assertion that the parents discussed "the ongoing CPS and law enforcement investigations" with any of the children.

b. Even though STARKES discussed the 12/20/20 visit by CITY police officers on 12/20/22 to the O'Neel home, she entirely omitted that the officers left the home, left the children in the home, and made no arrests nor issued any citations that night; obviously doing so because this would be an indication there was nothing rising to the level of an imminent risk of serious bodily requiring removal of the children.

c. That D.O., when speaking to his sister B.T. immediately after the incident in the kitchen on 12/20/21 reported he was, "fine."

d. That D.O. admitted that he lied about being choked by Faun at the SAFE interview. Saying that he was "mad," directly saying also,

**D.O.:** I don't know why I said it, but I regret it. And I said that she grabbed me by both her hands. But she didn't. **K.Seeley**: Okay. Tell me about how you're feeling right now. **D.O.:** I just wanted to apologize.

e. That D.O. said in the SAFE interview, when explaining why he gets in "the most trouble [at home]," said, "Well, instead of choosing to tell the truth, I tell a lie." Adding, "So I'm always getting in trouble."

f. That other of the children noted D.O. had an issue with lying.

g. That D.O. admitted at the SAFE interview that Faun merely grabbed him by the back of the neck to escort him to the kitchen because he was not listening.

h. That there were no marks or bruises on D.O. evidencing that he was choked or carried by the neck, despite the fact STARKES had noted that herself in her own notes of her interview with D.O.

i. That A.T. disclosed at the SAFE interview that, contrary to D.O.'s assertion, he was not carried to the kitchen but, instead, walked from his room to the kitchen.

j. That D.O. denied being pushed down the stairs by Faun on a prior occasion, and that the "combined" version of an alleged push down the stairs and a resulting injury to D.O.'s head that required "stitches," if even the former was a perception of D.O., were in fact two separate events entirely, and he had in fact injured his head later the same day jumping off of or falling off of a bed, or bed bunk ladder, injuring himself off or around on his bed.

k. That none of the past disciplinary history of the children rose to the level of child abuse.

l.  That nothing in the signed Safety Plan stated that visits between the parents and the children were to be "virtual."

m. Before the SAFE interview on December 30th, 2020, Faun had informed STARKES of cognitive deficiencies suffered by A.T., and Faun had literally told CATANIO on the day of the removal (12/22/20) that A.T.'s cognitive deficiencies were related in particular to an orientation as to "time."  Faun also gave DOMINIQUE SMITH (not a defendant), who was the social worker right at the timeframe of the removal because STARKES was on vacation, a copy of A.T.'s Individualized Education Plan, which reflected the aforementioned cognitive disability of A.T.  However, the interviewer (Seeley) was selected and allowed to conduct the interview despite this knowledge as to A.T.'s issue, and she was not trained to provide forensic interviews for special needs children.  Neither the fact of A.T.'s cognitive issues, or being advised of them, or the fact the interviewer at the SAFE Center was not equipped to do forensic interviews of a child with A.T.'s disability, was included in the warrant application.

n. That D.O. had said he felt "safe" with the parents at their home and B.T. (the eldest) had also said she felt D.O. was safe in the home.

84.   An important fact regarding what STARKES "knew" and did not "know" about the representations she was making in the warrant application, then the Petition and Detention Report, is that the events of 12/20/20, and the events of 12/22/20, are all contained in one single "police report."  Within that police report, was the admission by [D.O.] at the SAFE interview that he had lied about being choked.  As noted, somehow this critical fact, this mainstay claim of the "abuse," of this "choking and being carried" by his neck, was left out of the warrant application, the Petition, and the Detention Report.

THIRD AMENDED COMPLAINT FOR CIVIL RIGHTS VIOLATION

85.   Based on the foregoing false representations and omissions of fact by STARKES the Juvenile Court granted the request for protective custody warrants.

86.   The same day, on January 8, 2021, SMITH and STARKES filed Juvenile Dependency Petitions as to all four minors. Each petition was signed by SMITH and STARKES under penalty of perjury, and averred to the same facts alleged above, painted as a truly abusive scenario, and likewise had the same numerous omissions of exculpatory information.

87.   Despite their obligation to tell the complete truth, SMITH and STARKES made numerous misrepresentations of fact such as those identified hereinabove, which they knew to be untrue at the time made or, did not know one way or the other, and exhibited reckless disregard as to the truth of the matters asserted.

88.   SMITH and STARKES also concealed material exculpatory information in their possession. Among other things, in their petitions, SMITH and STARKES falsely represented that:

a. "The mother, Faun O'Neel, has untreated anger management, which impairs her judgment and ability to provide adequate care, protection, or supervision of the children...due in part to the mother's excessive corporal punishment of the children."

b. "On or about December 21, 2020, the mother placed both of her hands around the child's, [D.O.], throat, lifting him where his feet were off the ground/kicking, taking him into the kitchen."

c. "The mother's excessive corporal punishment of [D.O] places all of the children at risk for serious physical harm, abuse, and/or neglect."

89.   As in the warrant application, SMITH and STARKES concealed known, exculpatory information from the petitions, including, but not limited to all of the omissions mentioned in the paragraphs, above.

THIRD AMENDED COMPLAINT FOR CIVIL RIGHTS VIOLATION

90.   SMITH and STARKES also prepared and filed a Detention Report on January 11, 2021, wherein the same misrepresentations and omissions of fact noted hereinabove as to the warrant application were repeated; they had been in possession of the CITY police report over three weeks at that point.

91.   For example, while "the undersigned" acknowledged receiving a copy of the Folsom Police Report, they provided a distorted and incomplete summary of the police report, instead of attaching it to the Detention Report. SMITH and STARKES did so in order to conceal inconvenient truths, including, but not limited to, the admission in that D.O. made at the SAFE interview that he lied about the alleged choking because he was mad at his mother.

92.   Another fact disclosed in the police report was the fact that there were no marks or bruises on D.O. that were consistent with him being choked and carried by the neck.

93.   SMITH and STARKES also stated that, "It was also reported that the mother shoved the child, [D.O.], in the past, resulting in a hospital trip where [D.O.] required stiches in his head and the mother told the medical professionals that [D.O.] hit his head on his bed." However, said defendants intentionally omitted D.O.'s own statements at the SAFE interview, explaining that there were two separate events and that he did not go to the hospital because he fell down the stairs (or was "pushed"), but he had, "Later that day, [ ] decided to climb on my sisters bunk bed, and jump off, and cracked my head open;" this statement was right in the police report from which STARKES was quoting other facts in the Detention Report, the one she did not attach.

94.   Nowhere in the fraud filled Detention Report was there any mention of D.O. admitting that he lied to his sisters and lied to the police about being choked, or about his general propensity for lying.

95.   In the Detention Report SMITH and STARKES also repeated the false summary of the terms of the safety plan and, like the police report, intentionally failed to attach a copy for the court to review.

96.   Plaintiffs allege that the failure to attach these documents, containing pertinent and contradictory as well as exculpatory information, in documents submitted to the Court, is part and parcel of a long standing "practice" of the child welfare agency/COUNTY to obfuscate the "truth," regardless of whether it involves committing perjury to do so; this is addressed in the Claim for Relief regarding Monell liability below.  And Plaintiffs further allege this is an intentional act to corrupt the judicial process of the dependency court in which a family finds itself ensnared.  This long standing and well-settled practice of COUNTY leads to continued unlawful separation of children and their parents – as it did in this family's case – and violates their 4th and 14th Amendment rights against unreasonable seizures and unlawful interference in familial associations.

97.   As a broader proposition, this behavior not only cost the O'Neel family more money, as Danny and Faun had to occupy a hotel during all times the children were allowed to be in the care of Fara Canutt in the O'neel home, but is also costs the taxpayers thousands to hundreds of thousands of dollars each year supporting what is unknown to them to be a corrupt and fraud filled system, because the juvenile court system is closed and confidential from public oversight.

98.   SMITH and STARKES again falsely reported that A.T. "disclosed that on December 20, 2020, prior to law enforcement responding to the home, the parents conducted a family meeting," suggesting that Faun coached the children that she did not choke D.O. "but grabbed him by the back of the neck because he was not listening." As mentioned, above, no such disclosure was made at A.T.'s SAFE interview.

99.   At the detention hearing, the Juvenile Court accepted the false report of SMITH and STARKES into evidence, as it is required to do pursuant to California law, a requirement well known to SMITH and STARKES and all the social workers and supervisors who work for COUNTY. The juvenile Court relied upon said Detention Deport in ordering the continued detention of the children.

100.  As a result, the children were not returned fully to their parents, with all family members living fully in their home, until late May of 2021, at which point even then the agency social worker described allowing the grandparents to leave the O'neel home and Faun and Danny to return to it and live with the children, merely a "return to some normalcy," not to normal.

### GOVERNMENT CLAIM RE: STATE LAW CLAIMS

101.  Plaintiffs served a government claim against the City of Folsom and its agents on June 16, 2021. Defendant City of Folsom rejected the claim on or about June 24, 2021.

102.  Plaintiffs also served a government claim against the County of Sacramento and its agents on June 16, 2021. Defendant County of Sacramento did not provide any written notice rejecting the claim, thus Plaintiffs' claim was *de facto* rejected as a matter of law after 45 days.

### DAMAGES

103.  As a result of the conduct of Defendants, Plaintiffs have suffered severe emotional distress, anxiety, and general damage to their psyche, to such an extent as to cause physical manifestations, including, but not limited to, anxiety, depression, nausea, loss of appetite, sleep and diet disturbances, tearfulness, headaches, and general malaise.

104.  Due to the removal from grandmother Canutt, based on the false statements and numerous omissions of exculpatory information in the warrant application submitted by STARKES on January 8th, 2021, with ratification

THIRD AMENDED COMPLAINT FOR CIVIL RIGHTS VIOLATION

and approval of SMITH, D.O. was placed in a "foster care" home. During his time in that foster home, he was exposed to online pornography, and engaged in some behaviors that led to police involvement.  A fixation with nudity/pornography and subsequent behaviors by D.O. as a result of that exposure, led to D.O.'s placement in a private residential facility in April of 2022 that costs $14,035 per month. D.O. is still residing as of the filing of this Second Amended Complaint in said facility. This caused the incursion of medical/mental health related costs for D.O., and it is reasonably anticipated there will be future medical expense and therapy costs also.  These damages, as well as travel and lodging costs related to placement of D.O. in the facility, and the other family members visiting D.O. are claimed as damages according to proof at time of trial.

105. Separately, Plaintiff Faun O'neel suffered damages in the form of rent paid on additional housing for herself and Danny post STARKES and SMITH's filing of the warrant application and removal of children second time by way of the fraudulently obtained warrant to remove all the children.

106. Defendants acted with malice and with the intent to cause injury to Plaintiffs and/or acted with willful and conscious disregard of the rights of Plaintiffs, in a vile, despicable, and contemptible manner, both with regard to the removal of the children on 12/22/20, and the overwhelming fraud and withholding of crucial exculpatory information in the warrant application, Petition, and Detention Report, and therefore Plaintiffs are entitled to punitive damages intended to punish Defendants and to deter them and others similarly situated vis-à-vis employment with CITY as a police officer, and employment with COUNTY as social workers and supervisors, from engaging in such conduct in the future.

//

**FIRST CLAIM FOR RELIEF**

**WARRANTLESS SEIZURE OF CHILDREN (42 U.S.C. § 1983)**

(Plaintiff vs. CATANIO & WRIGHT, DOE CITY DEFENDANTS)

107. Plaintiffs incorporate by reference paragraphs 1 through 102 as if the same were fully set forth herein, as against CATANIO and WRIGHT for the unlawful warrantless removal of the children on December 22nd, 2020.

108. he right to familial association guaranteed under the Fourteenth Amendment is "clearly established" such that any reasonable law enforcement agent in Defendants' situation would know it is unlawful to remove a child under the circumstances of each of the O'neel children in December of 2020, from the care, custody, and control of its parents or to question, threaten, examine, or search a child in the absence of exigent circumstances without first obtaining a warrant.

109. Moreover, the right to familial association guaranteed under the Fourteenth Amendment to the United States Constitution was so clearly established that any reasonable law enforcement agent, including Defendants, would know that it is unlawful to continue to detain a child from the custody of her parent when that agent knows, or has reason to know, that there is no legal or factual basis for the continued detention.

110. Likewise, the children's rights to be free from unreasonable seizure was clearly established pursuant to the Fourth Amendment of the United States Constitution, and their rights were violated by their seizure.

111. These Defendants, and both of them, had, at all times relevant herein, an affirmative duty and obligation to recognize and conduct themselves in a manner that confirms, provides for, and does not violate the protections guaranteed Plaintiffs under the United States Constitution, including those under the Fourteenth Amendment, to include without limitation, the rights

against unreasonably seizure, the rights of familial association between Faun and her children, and general rights of privacy and family integrity.

112. On December 22, 2020, all of the Plaintiffs procedural due process rights pursuant to the Fourteenth Amendment were violated by the conduct of these Defendants.

113. At the time of said detention, Defendants, and each of them, knew a parent-child relationship existed between Faun O'Neel and her children, B.T., A.O., D.O., and A.T, and that Faun was entitled to the companionship, care, custody, and management of her children free of unwarranted government interference, and likewise her children were entitled to the companionship and care of Faun.

114. These Defendants, and both of them, failed to conduct a reasonable investigation into the facts prior to detaining each of the children and placing them in foster care, thus did also violated Plaintiffs' rights under the Fourteenth Amendment of the United States Constitution.

115. Each Defendant collaborated, acted, and/or conspired to violate Plaintiffs' civil rights.

116. These Defendants purposefully failed to seek and/or obtain a warrant, knowing that insufficient grounds or evidence existed to support such application and/or, as detailed in Plaintiffs' Sixth Claim for Relief, below, as a result of an unconstitutional policy, custom, or practice of never obtaining warrants prior to seizing children.

117. As a result of the unlawful actions and failures to act lawfully described hereinabove with regard to these Defendants, Plaintiffs claim as damages those specified in paragraphs 103 through 105 above.

118. Further, as a result of the manner and intentional conduct or reckless disregard of the Plaintiffs rights by these Defendants, Plaintiffs claim as damages the punitive damages specified in paragraph 106 above.

THIRD AMENDED COMPLAINT FOR CIVIL RIGHTS VIOLATION

1
2
3
## SECOND CLAIM FOR RELIEF
4
### UNLAWFUL SEARCH 12/22/20 (42 U.S.C § 1983)
5
(Plaintiffs vs. CATANIO, WRIGHT, DOE CITY DEFENDANTS)
6
119. Plaintiffs incorporate by reference paragraphs 1 through 102 as if the
7
same were fully set forth herein.
8
120. In doing the acts complained of herein, Defendants acted under the color
9
of the law to violate each of the Plaintiffs' right to be free from unreasonable
10
searches under the Fourth Amendment to the United States Constitution.
11
121. Defendants acted under color of law by unlawfully entering the family
12
home multiple times without a warrant or an exception to the warrant
13
requirement, thereby depriving them of their constitutionally protected rights.
14
122. Each Defendant collaborated, acted, and/or conspired to violate
15
Plaintiffs' civil rights.
16
123. Defendants purposefully failed to seek and/or obtain a warrant, knowing
17
that insufficient grounds or evidence existed to support such application
18
and/or, as detailed in Plaintiffs' Sixth Claim for Relief, below, as a result of
19
an unconstitutional policy, custom, or practice of never obtaining warrants
20
prior to entering homes without consent.
21
124. As a direct and proximate result of these Defendants' misconduct,
22
Plaintiffs have suffered, and will continue to suffer, general and special
23
damages according to proof at trial, including but not limited to, physical
24
and/or mental anxiety and anguish, among other things. Plaintiffs have also
25
incurred, and will continue to incur, attorneys' fees, costs and expenses,
26
including those authorized by 42 U.S.C. section 1988, to an extent and in an
27
amount subject to proof at trial.
28

- 30 -

125. Plaintiffs incorporate by reference as though fully set forth herein, the damages specified in paragraphs 103 through 105, as they apply to Plaintiffs claim for damages for the violation of the constitutional rights specified in this Claim for Relief based on the Defendant's conduct set forth hereinabove.

126. Plaintiffs incorporate by reference as though fully set forth herein, the damages specified in paragraph 106, as punitive damages apply to Plaintiffs' claim for damages for the violation of the constitutional rights specified in this Claim for Relief based on the Defendant's conduct set forth herein above.

<u>**THIRD CLAIM FOR RELIEF**</u>

**JUDICIAL DECEPTION & UNLAWFUL SEIZURE**

**– Warrant Application**

(Plaintiffs vs. STARKES and SMITH)

127. Plaintiffs incorporate by reference paragraphs 1 through 102 as if the same were fully set forth herein for a claim against STARKES and SMITH for the promulgation and submission of a warrant application with the numerous false representations of facts, half-truths, and omissions of exculpatory information noted above, which was used to exact an unlawful seizure of the children.

128. At the time (January 8th, 2020, when the children were taken from their home and mother Faun by way of the warrant granted on the fraudulent warrant application), there was no lawful Court order from any Court exercising jurisdiction over the O'Neel children.  The parents were cooperating with a Safety Plan, and were indeed visiting their children every day in their home under the watchful eye of Grandma Canutt, but the children were not under the jurisdiction of any Court and staying in their home.

129. Plaintiffs allege that Defendant STARKES deliberately fabricated false evidence against Plaintiffs with the multiple misrepresentations in the warrant application noted above, and intentionally or with reckless disregard omitted

exculpatory information as noted above, doing so in consultation with
SMITH, and with the review, ratification, and affirmative consent and
approval for submitting to the juvenile court of SMITH after SMITH's review
and proposed edits.

130. Plaintiffs are informed and believe that in fact SMITH forced changes to
the warrant application that STARKES did not agree with, and STARKES
knew such changes would yield a perjurious recounting of events and
circumstances known to STARKES from her involvement in the
investigation; still STARKES signed the warrant application under penalty of
perjury.

131. As a result of preparing the warrant application in the manner STARKES
and SMITH did, and submitting same to the Court, these Defendants caused a
second seizure of the children in less than three (3) weeks time, violating
Plaintiffs 4th and 14th Amendments previously stated in this Complaint.  The
warrant application accomplished the unlawful removal, and then supported
the following fraudulent and exculpatory information devoid Detention Repot
and Petition STARKES and SMITH submitted to the juvenile dependency
court, the latter two accomplishing the unlawful continued deprivation of the
O'Neel family members rights to family association under the Fourteenth
Amendment to the United States Constitution, and the continued violation of
the children's 4th Amendment rights of unreasonable seizure.

132. Said misrepresentations and fraudulent omissions in the warrant
application are described hereinabove at length.

133. At the time each misrepresentation of a fact was made, STARKES and
SMITH knew the representations were not true or acted in reckless disregard
by including representations for which she had no knowledge were true or
false.  And at the time of each omission/concealment of material facts,
STARKES and her supervisor SMITH knew that the warrant application was

not telling the complete truth, yet they submitted it to the juvenile dependency court with the objective of misleading the Superior Court of California to issue a warrant to seize all of the children, which the Court did.

134. As a result of the unlawful actions and failures to act lawfully described hereinabove with regard to these Defendants, Plaintiffs claim as damages those specified in paragraphs 103 through 105 above.

135. Further, as a result of the manner and intentional conduct or reckless disregard of the Plaintiffs rights by these Defendants, Plaintiffs claim as damages the punitive damages specified in paragraph 106 above.

<u>**FOURTH CLAIM FOR RELIEF**</u>

**JUDICIAL DECEPTION & CONTINUED DETENTION**

**By W&IC 300 Petitions**

(Plaintiffs vs. STARKES, SMITH and DOE COUNTY DEFENDANTS)

136. Plaintiffs incorporate by reference paragraphs 1 through 102 above as if the same were fully set forth herein as against STARKES and SMITH for a claim against STARKES and SMITH for the promulgation and submission to the juvenile court of the four children's Welfare & Institutions Code 300 Petitions, containing the numerous false representations of fact, half-truths, and omissions of exculpatory information noted above.

137. At the time each misrepresentation and omission of exculpatory information was made, said Defendants knew the statements were not true or acted in reckless disregard by including representations for which they had no knowledge they were true or false, and in many instances were misrepresenting facts they actually knew to not be as stated.

138. At the time of each concealment of material fact, said Defendants knew that they were not telling the complete truth with the objective of misleading the Superior Court of California to continue the detention of the children.

139. The Petitions accomplished the unlawful continued deprivation of the children and continued the violation of the O'neel family members rights to family association under the Fourteenth Amendment to the United States Constitution, and the continued the violation of the children's 4th Amendment rights of unreasonable seizure.

140. As a result of the unlawful actions and failures to act lawfully described hereinabove with regard to these Defendants, Plaintiffs claim as damages those specified in paragraphs 103 through 105 above.

141. Further, as a result of the manner and intentional conduct or reckless disregard of the Plaintiffs rights by these Defendants, Plaintiffs claim as damages the punitive damages specified in paragraph 106 above.

## FIFTH CLAIM FOR RELIEF
### JUDICIAL DECEPTION & CONTINUED DETENTION
### By Detention Report

(Plaintiffs vs. STARKES, SMITH and DOE COUNTY DEFENDANTS)

142. Plaintiffs incorporate by reference paragraphs 1 through 102 as if the same were fully set forth herein for a claim against STARKES and SMITH for the promulgation and submission to the juvenile court of a Detention Report with the numerous false representations of facts, half-truths, and omissions of exculpatory information noted above.

143.  Plaintiffs allege that Defendants SMITH and STARKES deliberately fabricated evidence against Plaintiffs, and that as a result of this evidence in a report which both STARKES and SMITH knew the juvenile dependency court judge was required to consider in ruling on whether to release the children to the parents, which a juvenile dependency court can do and still the child welfare agency can pursue a ruling that the Court take jurisdiction over the children, the Plaintiffs all suffered a continued deprivation of their right to family association under the Fourteenth Amendment to the United States

Constitution, and the children suffered a further violation of their 4th Amendment rights against unreasonable seizure.

144. At the time each misrepresentation was made, said Defendants knew the statements were not true or acted in reckless disregard by including representations for which they had no knowledge were true or false or a misrepresentation of facts they already knew to be untrue as stated. At the time of each concealment of material fact, said Defendants knew that they were not telling the complete truth with the object of misleading the Superior Court of California to continue the detention of the children, and it worked.

145. As a result of Defendants' fraudulent and perjured statements, Plaintiff Faun and her children remained separated for over 5 months, and to this day as a result of the actions of these Defendants, Faun, D.O., and the rest of the O'neel family remain in circumstances whereby D.O. is not residing with the family due to the actions of these Defendants.

146. As a result of the unlawful actions and failures to act lawfully described hereinabove with regard to these Defendants, Plaintiffs claim as damages those specified in paragraphs 103 through 105 above.

147. Further, as a result of the manner and intentional conduct or reckless disregard of the Plaintiffs rights by these Defendants, Plaintiffs claim as damages the punitive damages specified in paragraph 106 above.

## SIXTH CLAIM FOR RELIEF

### *MONELL* RELATED CLAIMS

(Plaintiffs vs. CITY & COUNTY)

148. Plaintiffs incorporate by reference paragraphs 1 through 102 as if the same were fully set forth herein.

149. CITY, including through its Folsom Police Department entity, is a "person" within the meaning of 42 U.S.C. § 1983 and subject to Monell liability. (Monell v. Dept. of Social Services (1978) 436 U.S. 658.)

150. COUNTY, including through its DCFAS entity is also a "person" within the meaning of 42 U.S.C. § 1983 and subject to Monell liability.

151. Defendants, City of Folsom and County of Sacramento, including through their respective agencies, had a duty to Plaintiffs at all times to establish, implement and follow policies, procedures, customs and/or practices (hereinafter referred to as "policy" or "policies") which confirm and provide the protections guaranteed Plaintiff under the United States Constitution, including those under the Fourth, and Fourteenth Amendments, to include without limitation, the protection of the right to familial relations; the right to privacy; the right not to be defamed or stigmatized; the right to be free from unlawful searches and entry into persons private residences; and the right to both procedural and substantive due process.

152. Defendants also had a duty to supervise, train, control and review the activities and actions of all their employees who interact with the public so as to protect the aforementioned constitutional rights and take such steps as necessary to cause employees to refrain from violating citizens constitutional rights as occurred with Plaintiffs.  Indeed City and County are required by law to do these things in order to avoid causing exactly the kinds of violations of constitutional rights, and the kinds of injuries and damages alleged herein (see *Wallis v. Spencer*, 202 F.3d 1126, 1141 (9th Cir. 2000), *Mabe v. San Bernardino County, Dept. of Public Social Services*, 237 F.3d 1101 (9th Cir. 2001), *Rogers v. County of San Joaquin*, 487 F.3d 1288 (9th Cir. 2007), *Demaree v. Pederson*, (9th Cir. 2018) 887 F.3d 870, *Mann v. County of San Diego*, (9th Cir. 2018) 907 F.3d 1154, and many more).

153. Based on the duties charged to City of Folsom and County of Sacramento, related to the nature of work (child abuse investigations) which is a usual and recurring situation with which their employees are engaged, the failure to adequately train their employees evidenced by the conduct of

removing Plaintiff Faun O'Neel's children as factually alleged in this case on December 22nd, 2020 – as to CITY, and yet again on February 8th, 2021 – as to COUNTY, in addition to the multiple familial rights association violation cases brought by other parents and children whose children were unlawfully removed set forth herein below spanning over 15 years, make it reasonable to believe – and Plaintiffs allege - that the Defendant County and City have been and remain to this day (see *Henao v. County of Sacramento*, Case #2:22-cv-00352-MCE-KJN) deliberately indifferent to the constitutional rights of familial association enjoyed by parents and children in the United States pursuant to the U.S. Constitution, its Amendments, the decisions of the 9th Circuit Court of Appeal having jurisdiction over the State of California as to federal law, and that the CITY and COUNTY'S failure to provide adequate training of employees such as the individually named Defendants herein was the moving force behind the removal of the minor children in this suit and the constitutional violations related thereto and complained of herein.

154. To the extent training is provided by the entities, it lacks explication of the full considerations that social workers and law enforcement personnel must evaluate and the standards that must be met under those circumstances for the removal or separation of a child from his or her parents to be lawful under the U.S. Constitution and it's Amendments, and the plethora of decisional law that informs both the contours of the familial association rights, and the circumstances that can make removal of a child both "truly exigent" and done without violating a family's rights.

155. Neither CITY or COUNTY takes any measures to "audit" the efficacy of the trainings they do provide employees, which is to say, absolutely no effort is made to ascertain whether or not the employees are absorbing and/or actually understanding or comprehending the gravamen of the trainings that they may receive, if any.

156. Plaintiffs allege that none of the social workers and/or law enforcement officers in any of the previous unlawful removals of children listed by way of lawsuit titles herein below, and the countless other instances of unnecessary at best, unlawful at worst removals of children previously that never make it into the public eye due to the closed-door everything-is-confidential nature of juvenile dependency proceedings in this state, were ever disciplined or reprimanded for their violation of the parents or children's rights, and that none of the individually named Defendants herein working for either CITY or COUNTY who removed the children of Faun O'Neel without the requisite exigency or consent to make the removal lawful, have been disciplined or reprimanded for their violation of this families rights; not one.

157. The CITY and COUNTY  have engaged in a long standing practice and custom of removing children from their parents in the course of investigating a referral for child abuse or neglect without first doing a reasonable investigation, and then further without reasonable cause to believe that the child/ren were at such an imminent risk of serious bodily injury that there was both insufficient time within which to obtain a warrant, and also, there were no alternative means that were less intrusive into the sanctity of the family reasonably available to protect the child/ren from whatever injury the government actor believed was likely to occur imminently.

158. As to COUNTY, Each of the cases cited below, all of which were actually filed in either this District Court or the Superior Court of the State of California for Sacramento County, involved the removal of children from their parent or parents in the absence of an imminent risk of serious bodily injury, when there existed both sufficient time to obtain a warrant and numerous lesser intrusive alternatives to removal reasonably available.  They span the past 17 years – thus constituting a widespread and long-standing practice – and Plaintiffs allege that such practice, engendered and fostered a

rote response to remove the O'Neel children by the entity employees sued herein and all others who succumb to a widespread practice (i.e. "the way we do things"), and therefore such practice and custom was a moving force in the removal of the minor children of Faun O'Neel by the individually named Defendants.

159. As another aspect of the practice and custom of the entity Defendants City and County that is widespread and longstanding, is that if their employees make a decision to remove one child from a whom, possibly the only child for whom there has been any claim of neglect or abuse, then the employees will seize and remove all of the children in a home without undertaking a particularized or reasonable investigation and accounting for whether the circumstances really do qualify as exigent circumstances and there are no lesser intrusive alternatives regarding each child; such practices – widespread as they are across all child welfare and law enforcement agencies – have some common descriptive phrases such as the "ad-sib policy," and/or the "take one, take all" policy.

160. Just as with the practice and custom of conducting unlawful warrantless removals generally, this practice of removing all children in a home if even only one is the subject of allegations which might justify removal, is what motivated and generated a rote response by DCFAS personnel to remove all of the O'Neel children by the entity employees sued herein despite the fact there was an allegation of abuse as to solely one child, as is the widespread and longstanding practice, and therefore such practice and custom was a moving force in the removal of the minor children of Faun O'Neel by the individually named Defendants.

161. Each of the following cases involved families suffering unlawful warrantless removals of children, and all received payment of significant settlements as a result of their lawsuits; *Jonathan Welch v. County of*

*Sacramento*, case 2:07-cv-00794-GEB-EFB, *Angel Clokey v. County of Sacramento*, case 2:08-cv-02239-MCE-EB, *Edward Olvera v. County of Sacramento*, case 2:10-cv-00550-WBS-KJM (involved a warrant, however, a warrant determined by the Court – Hon. William B. Shubb – for which genuine issues of material fact existed as to whether it had been obtained through judicial deception), *Joseph Henao v. County of Sacramento*, 2:22-cv-00352-MCE-KJN, *Anna Nikolayev v. County of Sacramento* (State Court) 2001620, *Giammona v. County of Sacramento* (State Court) Case No. 05AS02156, and *Joseph Best v. County of Sacramento*, 06AS8354S.

162. The *Welch* matter involved allegations regarding one child, all three were taken.

163. *Olvera* matter involved allegations regarding one child, seven children were taken.

164. The *Giamonna* matter involved allegations regarding one child, yet two children were taken.

165. The other matters listed above involved only one child except Best, in which there were two children and the allegation was mother's severe mental health issues and claims – from that mother with severe mental health issues – that father committed domestic violence.

166. In this matter, allegations involved only one child, yet four children were taken.

167. Another pattern and practice of the COUNTY DFACS is the constant lies, misrepresentations, and omissions of exculpatory evidence in warrant applications, W&IC 300 Petitions, and Detention Reports, as well as any other kind of report or document which DFCAS personnel might prepare in the course of an investigation of a referral or for submission to the juvenile dependency court.  Again, the aforementioned cases provide a rich history of

false claims, misrepresentations, and omissions of exculpatory, clarifying, or mitigating information.

168. In *Welch*, social worker Misty Sampson of DFACS stated in a court report that the Welch child S.W. had told her that her father had caused a bruise on her ear; the child denied that she ever told Sampson any such thing.

169. Although Sampson knew that the child had given no less than four different accounts as to how the slight bruise on the lobe of her left ear had occurred during an interview at her elementary school, Sampson left out of reports she filed with the Court entirely the fact that the child had given multiple differing accounts, just the story line she/DFACS wanted to push was included, which was that father had somehow caused the bruise.

170. Then, despite that fact that the child repeatedly said that the only claim DFACS was hanging its hat on was not true, the claim her father caused a bruise on her ear, through the lies and omission of exculpatory information to the Court, Sampson and other defendant social workers were able to successfully keep the two other minor children from their parents for a period of eight (8) months, and the child S.W. for twelve (12) months. She had a significant mental breakdown or other mental crisis during her time in the care of the COUNTY.

171. In *Olivera*, was a disgusting and horrible abuse of two parents who dedicated their lives to special needs children, and in which the father (Edward) was himself a social worker with COUNTY!  They ran a parent cooperative out of their overly large home in Sacramento, where parents with the most traumatized, emotionally and behaviorally challenged children went for help, and over the years Edward and Carla had adopted several of the most damaged children placed with them by other child welfare agencies. That did not stop the pattern and practice of lying and withholding information from the Court one bit, indeed, it seemed to ramp it up.

172. During the COUNTY social workers assault on the Olivera family, they lied about all the following in documents submitted to the juvenile dependency court:

- a claim that during a visit to the home – an unannounced visit with no authority from Carla to enter more than the front hall – Carla appeared "visibly upset acting erratic and hostile;"

- forty-seven days after COUNTY social worker surname Lopez went to the Olvera home and viewed twelve children without a single mark or injury or complaint of any kind about their lives in the care of the Olvera's and investigated the co-op program that by all accounts was saving children's lives and helping them overcome severe emotional, psychological, and behavioral maladies, and after receiving more than a half-dozen letters of support from parents, therapists, and children, extolling the virtues of the Olveras', their commitment to and expertise with the children in their care, in addition to phone calls from parents stating the same, Lopez prepared a pleading and request for a protective custody warrant in which she left out all of the following information of which she was well aware,

- the nature of the program and the work that the OLVERA'S were doing with the children all with special needs in their home, including the education of the children's parents to assist them in parenting the children,

- the credentials of Carla and Edward as mental health professionals and trained forensic interviewers, as well as the fact Edward was a former COUNTY social worker,

- the severe emotional and psychological issues confronting the children they have in the program and the fact that standard therapy / counseling

and behavioral modification regimens could not, would not, and did not,
help the children prior to their involvement in the Olvera's program,

- the lack of any signs of physical injury to any of the children in the
home, or any complaints by the children – and in fact their statements of
love and support for the home and what it had done to improve their
lives, they had all literally told Lopez they were happy, felt safe, did not
want to leave the home,

- the receipt by Lopez of over a half dozen letters and phone calls from
parents, children, mental health professionals, and other percipient
witnesses extolling the Olevara's and their work,

- the fact that the claims by a child designated CHD-O about sexually
inappropriate touching by one of the previously sexually traumatized
children – meaning, before placement with his adoptive parents who put
him in the Olvera's program - were fully investigated by Carla and the in-
house therapist Ms. La Valleycare who worked with the child for over a
year (both mandated reporters), and deemed the claim not even worthy of
a referral to CPS,

- the actual physical impossibility of the act of inappropriate touching
alleged by CHD-O, as it was alleged, which physical impossibility of it
as the child described it (being touched by another of the children under a
closed and locked bathroom door) was abundantly clear and that was also
known to Lopez as it was demonstrated to Lopez in the Olvera home,

- the fact that the law enforcement officers who responded to the
OLVERA home on December 19th, 2008, had concluded that there was
no reason to remove the children from the home and no reason to suspect
there had actually been any abuse of CHD-O or any of the other children
in the home,

THIRD AMENDED COMPLAINT FOR CIVIL RIGHTS VIOLATION

- Lopez lied and exaggerated about a technique of safe restraint for children experiencing severe emotional dysregulation who may cause harm to themselves or others, which was used in the Olvera home on occasion ("strong sitting"), and which both Carla and Edward were trained for, to paint both as physically abusing the children,

- Lopez also demonized the Olvera parents use of another restraint method ("face down") used in the home, which she used herself in the past working with troubled youth in the Sacramento Children's Home,

-  that Lopez had been involved in the matter for forty-four days by the time she submitted the warrant application, the whole while being well aware that CHD-O was living in the home with the alleged "perpetrator" she now needed a warrant to remove the child from the presence of, the irony if not misrepresentation thus being that in her warrant application Lopez stated the following to paint the parents in a false light, saying "[Carla] has allowed the alleged perpetrator to remain in the home and access to the child."

173. On 3/19/13 the Court currently presiding over this matter as of August 2023, determined that the Plaintiffs Carla & Edward Olvera had established genuine issues of material fact as to their claim that the protective custody warrant obtained by COUNTY had been obtained through judicial misrepresentations.

174.  In *Giamonna*, again the social worker handling the investigation of a home and family not unlike the Olvera's, who also worked with troubled emotionally damaged children, told numerous lies in reports to the juvenile dependency court to justify post-hoc the seizure of the children.  One such recurring lie was a description by the social worker of a basically filthy and unsafe home.  In *Giamonna*, in possibly the only instance of its kind in in a juvenile dependency matter in history, the juvenile dependency judge stopped

a hearing mid-process, and ordered a "field trip" to the *Giamonna* home, which the Court, court staff, the parties and counsel, all departed for immediately.

175. After the "field trip," fining the home absolutely clean, proper, and well maintained, the judge wrote a scathing 21 page opinion which lambasted the COUNTY for engaging in a vendetta against the family.

176. The kind of falsification of reality engaged in by STARKES and SMITH in this case is nothing new, it is in fact a pattern and practice of COUNTY social workers, long standing and well settled.

177. As a result of the unlawful actions and failures to act lawfully described hereinabove with regard to these Defendants, Plaintiffs claim as damages those specified in paragraphs 103 through 105 above.

<u>**SEVENTH CLAIM FOR RELIEF**</u>

**FALSE IMPRISONMENT**

(Plaintiffs vs. CATANIO, WRIGHT, DOE CITY DEFENDANTS, STARKES, SMITH, DOE COUNTY DEFENDANTS)

178. Plaintiffs incorporate by reference paragraphs 1 through 102 as if the same were fully set forth herein as regards a claim against CATANIO and WRIGHT and unknown DOE CITY DEFENDANTS for false imprisonment of the minor children on December 22nd, 2020, and against STARKES and SMITH for their false imprisonment of the minor children on January 8th, 2021

179. On December 22, 2020, Defendants, CATANIO, WRIGHT, DOE CITY DEFENDANTS, DOE COUNTY DEFENDANTS, and DOES 1 through 10, inclusive, as well as CITY by virtue of the vicarious liability principles of *respondeat superior*, intentionally deprived Plaintiffs, B.T., A.O., D.O., and A.T. of the freedom of movement through seizure, transportation, and

THIRD AMENDED COMPLAINT FOR CIVIL RIGHTS VIOLATION

detention and/or conspired with and agreed with one another to commit the same, such that all said defendants are responsible for the resulting harm.

180. None of the Plaintiffs, including the mother of B.T., A.O., D.O., and A.T., consented to the seizure, transportation, and detention of the minor children.

181. Defendants, and each of them, did not have judicial authorization to seize and detain the minor children. Further, the seizure of each of the children was not supported by exigent circumstances.

182. In promulgating and submitting the warrant application as STARKES and SMITH did, which led to the second seizure of the children with a warrant obtained by fraud and omission of exculpatory information, these Defendants also exacted a false imprisonment of the minor children on January 8th, 2021.

183. As a direct and proximate result of these Defendants' misconduct, these Plaintiffs have suffered, and will continue to suffer, general and special damages according to proof at trial, including but not limited to, physical and/or mental anxiety and anguish, among other things.

184. Defendants, CITY and COUNTY, are vicariously responsible for the conduct of their respective agents and employees, including, but not limited to, CATANIO, WRIGHT, DOE CITY DEFENDANTS, DOE COUNTY DEFENDANTS, and DOES 1-10, pursuant to California Government Code Section 815.2 and other applicable statutory and case law.

185. Plaintiffs incorporate by reference as though fully set forth herein, the damages specified in paragraphs 103 through 105, as they apply to Plaintiffs claim for damages for the violation of the constitutional rights specified in this Claim for Relief based on the Defendant's conduct set forth hereinabove.

186. Plaintiffs incorporate by reference as though fully set forth herein, the damages specified in paragraph 106, as punitive damages apply to Plaintiffs'

claim for damages for the violation of the constitutional rights specified in this Claim for Relief based on the Defendant's conduct set forth herein above.

## JURY TRIAL DEMAND

187. Plaintiff demands a jury trial on each Claim for Relief set forth above.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff prays for judgment against Defendants as follows:

1. General damages and special damages according to proof;

2. As against the individual defendants, punitive damages as allowed by law;

3. Attorney's fees and costs pursuant to 42 U.S.C. § 1988, and any other appropriate statute;

4. Costs of suit incurred herein; and

5. Such further relief as the Court deems just and proper.


POWELL & ASSOCIATES


Dated: 8/20/2023            By:    /s/Robert R. Powell
                                  ROBERT R. POWELL
                                  Attorney for Plaintiffs

THIRD AMENDED COMPLAINT FOR CIVIL RIGHTS VIOLATION