1

2

3

4

5

6

7

8                    UNITED STATES DISTRICT COURT

9                    EASTERN DISTRICT OF CALIFORNIA

10                         ----oo0oo----

11

12   FAUN O'NEEL, individually and as        No. 2:21-cv-02403 WBS DB
     Guardian Ad Litem for her
13   children B.T., A.O., D.O., and
     A.T.,
14                                            MEMORANDUM AND ORDER RE:
                Plaintiffs,                   COUNTY OF SACRAMENTO, SASHA
15                                            SMITH, AND KERYN STARKES'
          v.                                  MOTION FOR SUMMARY JUDGMENT
16
     CITY OF FOLSOM, a public entity;
17   SPENSER HEICHLINGER, an
     individual; MELANIE CATANIO, an
18   individual; LOU WRIGHT, an
     individual; DOE CITY OF FOLSOM
19   DEFENDANTS, individuals; KERYN
     STARKS, an individual; SASHA
20   SMITH, an individual; COUNTY OF
     SACRAMENTO, a public entity; DOE
21   DCFAS DEFENDANTS, individuals;
     and DOES 1 through 10,
22   inclusive,

23                Defendants.

24

25                         ----oo0oo----

26        Plaintiff Faun O'Neel, individually and as guardian ad

27   litem for her children B.T., A.O., D.O., and A.T, brought this §

28   1983 action alleging that defendants' removal of her four

                                  1

1   children violated, inter alia, their Fourteenth Amendment right

2   to familial association.  (Second Am. Compl. ("SAC") (Docket No.

3   49).)  Donnie Cox was subsequently appointed guardian ad litem

4   for the four children on February 23, 2022.  (Docket No. 9.)

5   Defendants County of Sacramento, Sasha Smith, and Keryn Starkes

6   now move for summary judgment.  (Docket No. 80.)

7   I.   Factual and Procedural Background

8        Plaintiff Faun O'Neel is the mother of child plaintiffs

9   A.T., D.O., A.O., and B.T.  (See Docket No. 93 at 56.)  Danny

10  O'Neel, not a party to this matter, is Faun O'Neel's husband and

11  the children's stepfather.  (See id.)

12       On December 20, 2020, D.O. left out food that the

13  family's dog got into and made a mess in the kitchen, and Faun

14  O'Neel disciplined D.O.  (See Sealed Detention Report at 3-4.)

15  Following this incident, D.O. told his sister B.T. that his

16  mother choked him with both hands and carried him by the neck.

17  (See Defs.' Statement of Undisputed Facts ("SUF") (Docket No. 80-

18  1) ¶ 5.)  B.T. then called 911 concerning D.O.'s choking

19  allegation.  (Id. ¶ 6.)[1]

20       Folsom Police Department officers responded to the 911

21  call and interviewed the children.  (See Docket No. 93 at 48-51.)

22  The officers left without removing the children from the home.

23  (See Pls.' Statement of Material Facts ("SMF") ¶ 11.)  Two days

24  later, on December 22, 2020, Officer Melanie Catanio removed the

25

---

26       [1]   Faun O'Neel maintained that she only grabbed D.O. by
    the back of the neck to get him to comply with her order to clean
27  up the food and did not choke him or pick him up by the neck.
    (See Docket No. 93 at 16.)  D.O. later recanted the choking
28  allegation.  (See SUF ¶ 80.)

2

four children from the home without a warrant, and thereafter interviewed the two older children, B.T. and A.O., at the Folsom Police Department. (SUF ¶ 11.) During her interview, A.O. made additional allegations that the parents physically punished both D.O. and herself, including smacking in the face and hitting with a belt. (Id. ¶¶ 14-16.) Following the interviews, the children were placed in the custody of the County of Sacramento Child Protective Services Department ("CPS"). (See id. ¶ 18.)

Keryn Starkes and Sasha Smith are social workers employed by CPS who were assigned to the O'Neel case. (See id. ¶¶ 43-50.) Sasha Smith was Keryn Starkes' supervisor. (See id. ¶ 20; SMF ¶ 36.)

Pursuant to a safety plan agreed upon by Starkes, the O'Neel parents, and maternal grandmother Fara Canutt on December 24, 2020, the children were placed into the custody of Canutt at the family home, while the parents were to live in a different location and were permitted to have supervised visitation. (See SUF ¶¶ 21-23.) The safety plan also required that the parents refrain from attempting to influence what the children said to law enforcement. (See id. ¶ 23.)

On January 8, 2021, Starkes filed petitions to have the children declared dependents of the Juvenile Court pursuant to California Welfare & Institutions Code § 300. (See id. ¶ 47.) That same day, Starkes also prepared and submitted a warrant application[2] for the removal of all four children pending a

---

[2]    While separate applications were submitted for each child, the substantive content of the applications was identical. (See SMF ¶ 26.) The court will therefore use the singular "application."

3

1    hearing on the § 300 petitions, pursuant to Welfare &

2    Institutions Code § 340(b)(2).  (See id. ¶ 45.)  The warrant

3    application was granted by a judge the same day.  (Id.)  The

4    children were then placed into CPS custody.  (See Sealed

5    Detention Report at 2.)

6         A detention hearing was held on January 14, 2021.  At

7    the hearing, a different judge determined that CPS had made a

8    prima facie case that the children satisfied the criteria of §

9    300 due to a risk of physical abuse.  (SUF ¶¶ 70-72.)  At a

10   dispositional hearing on February 1, 2021, that judge sustained

11   the § 300 petitions by a preponderance of the evidence and

12   adjudged the children as dependent children of the Juvenile

13   Court.  (Id. ¶ 74.)  The court ordered the mother and children to

14   reside in the same home as the parental grandparents until

15   further order of the Court.  (Id.)  The children's dependency

16   status was terminated on July 22, 2021.  (Id. ¶ 75.)

17   II.  Legal Standard

18        Summary judgment is proper "if the movant shows that

19   there is no genuine dispute as to any material fact and the

20   movant is entitled to judgment as a matter of law."  Fed. R. Civ.

21   P. 56(a).  A party may move for summary judgment either for one

22   or more claims or defenses, or for portions thereof.  Id.

23        The moving party typically bears the initial burden of

24   establishing the absence of a genuine issue of material fact and

25   may satisfy this burden by presenting evidence that negates an

26   essential element of the non-moving party's case.  See Celotex

27   Corp. v. Catrett, 477 U.S. 317, 322-23 (1986).  However, summary

28   judgment must be entered "against a [non-moving] party who fails

4

1    to make a showing sufficient to establish the existence of an

2    element essential to that party's case, and on which that party

3    will bear the burden of proof at trial."  See id.  Any inferences

4    drawn from the underlying facts must be viewed in the light most

5    favorable to the non-moving party.  See Matsushita Elec. Indus.

6    Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

7    III. Discussion

8         As relevant here, plaintiffs' third claim, brought

9    against defendants Starkes and Smith, alleges judicial deception

10   in the warrant application in violation of plaintiffs'

11   constitutional right to familial association.  The seventh claim

12   alleges that Starkes and Smith are liable for false imprisonment

13   based on false representations made in the warrant application.

14   The sixth claim alleges that the County of Sacramento is liable

15   pursuant to Monell v. Department of Social Services of City of

16   New York, 436 U.S. 658 (1978).[3]

17        A.   Judicial Deception

18        "The interest of parents in the care, custody, and

19   control of their children is perhaps the oldest of the

20   fundamental liberty interests recognized by the Supreme Court."

21   

22   ─────────────────
          [3]   The first and second claims were brought against the
     other defendants (Catanio, Wright, and City of Folsom), who have
23   since settled.  (See Docket No. 96.)
          Plaintiffs' opposition brief indicates that they have
24   "elect[ed]" not to pursue the fourth and fifth claims, which
     allege judicial deception in other documents filed with the
25   Juvenile Court.  (See Opp'n (Docket No. 88) at 7.)  Plaintiffs
     further represent that they "will submit a dismissal of the
26   Fourth and Fifth Claims."  (Id.)  Plaintiffs have not yet filed a
     pleading voluntarily dismissing these claims.  However, based on
27   plaintiffs' clear intention to abandon them, the court will
     dismiss the fourth and fifth claims.
28   

                                    5

David v. Kaulukukui, 38 F.4th 792, 799 (9th Cir. 2022) (cleaned up).  "[A]s part of the right to familial association, parents and children have a 'right to be free from judicial deception' in child custody proceedings and removal orders."  Id. at 800.

"To support a § 1983 claim of judicial deception, a plaintiff must show that the defendant deliberately or recklessly made false statements or omissions that were material to the finding of probable cause."  Greene v. Camreta, 588 F.3d 1011, 1034-35 (9th Cir. 2009), vacated in part on other grounds, 661 F.3d 1201 (9th Cir. 2011).

Under California law, "a warrant to remove a child prior to a hearing cannot issue absent a showing of probable cause to believe that '[t]here is a substantial danger to the safety or to the physical or emotional health of the child' and '[t]here are no reasonable means to protect the child's safety or physical health without removal.'"  Scanlon v. County of Los Angeles, 92 F.4th 781, 805 (9th Cir. 2024) (quoting Cal. Welf. & Inst. Code § 340(b)(2)-(3)).

In the context of a judicial deception claim, "[a] misrepresentation or omission is 'material' if a court 'would have declined to issue the order had [the defendant] been truthful.'"  David, 38 F.4th at 801 (quoting Greene, 588 F.3d at 1035) (alteration in original).  "Whether a false statement was 'material' to the finding of probable cause is a question of law for the reviewing court."  Greene, 588 F.3d at 1035; see also Chism v. Washington State, 661 F.3d 380, 389 (9th Cir. 2011) (materiality is a "purely legal question").  But see Scanlon, 92 F.4th at 802 (treating materiality as issue to be determined by

1  "reasonable trier of fact," but not addressing whether
2  materiality is a factual or legal question).

3          1.  <u>Smith</u>

4          It is undisputed that Starkes was responsible for the
5  preparation of the warrant application.  (See SUF ¶ 45.)  Smith,
6  Starkes' supervisor, did not sign the warrant application.  (See
7  Docket No. 93 at 74.)  As far as the court can discern, Smith's
8  only involvement with the warrant application was her review of
9  it in her capacity as Starkes' supervisor.  (See Keryn Starkes
10  Dep. at 61:21-22, 135:20-136:14; Sasha Smith Dep. at 74:11-75:7.)
11  It appears that Smith did not review the underlying evidence or
12  documentation.  (See SUF ¶ 56; Sasha Smith Dep. at 78:2-17.)

13          The parties have not identified any evidence in the
14  record that suggests Smith had reason to doubt the accuracy of
15  the representations made by Starkes' warrant application.
16  Moreover, plaintiffs have not identified, and the court is
17  unaware of, any authority holding that a supervisor must review
18  the underlying evidence or documentation for a warrant
19  application prepared by her subordinate.  "Omissions or
20  misstatements resulting from negligence or good faith mistakes
21  will not invalidate an affidavit which on its face establishes
22  probable cause," and "a claim of judicial deception [may not] be
23  based on an officer's erroneous assumptions about the evidence he
24  has received."  <u>Ewing</u>, 588 F.3d at 1224; <u>see also</u> <u>Motley v.</u>
25  <u>Parks</u>, 432 F.3d 1072, 1081 (9th Cir. 2005), <u>overruled on other</u>
26  <u>grounds by</u> <u>United States v. King</u>, 687 F.3d 1189 (9th Cir. 2012)
27  ("law enforcement officers are generally entitled to rely on
28  information obtained from fellow law enforcement officers").

1   Smith's reliance on Starkes' representations thus cannot form the

2   basis for a judicial deception claim.  See Ewing, 588 F.3d at

3   1224.  Accordingly, the court will grant summary judgment on the

4   third claim in favor of defendant Smith.

5        2.   Starkes

6        As stated above, defendant Starkes drafted the warrant

7   application.  Plaintiffs advance several theories concerning

8   Starkes' alleged judicial deception in the warrant application.

9             a.   Failure to Review SAFE Interviews

10       It is undisputed that Starkes relied on the

11  representations of Officer Catanio and Dominique Smith concerning

12  the content of the SAFE interviews, rather than reviewing the

13  SAFE interview recordings or transcripts.  Plaintiffs argue that

14  this constitutes reckless disregard for the truth.  They take

15  issue with two representations or omissions that Starkes relied

16  upon: first, Catanio and Dominique Smith's failure to inform her

17  of the fact that D.O. recanted the choking allegation during the

18  interview; and second, their representations that the children

19  had been coached prior to their interviews in violation of the

20  safety plan.

21       Catanio, who observed the interviews (see SUF ¶ 28),

22  sent an email received by Dominique Smith and Starkes (see id. ¶¶

23  40, 42) conveying her conclusion that the children had

24  "clear[ly]" been coached on "what to say, and . . . what not to

25  say," in violation of the safety plan, such that the "integrity

26  of the [SAFE] interviews was completely compromised" (Docket No.

27  93 at 66).  One of Dominique Smith's Case Management System

28  ("CMS") entries also indicates generally that the safety plan was

8

not followed.  (See Dominique Smith Dep. at 71:18-24.)  Dominique Smith's CMS entries do not indicate that D.O. recanted the choking allegation during his SAFE interview, nor does Catanio's email concerning the interviews.  (See Dominique Smith Dep. at 68:23-70:4; Docket No. 93 at 66.)  Starkes relied upon these representations in drafting the warrant application.  (See Docket No. 93 at 73.)

It is true that Starkes knew about the SAFE interviews prior to filing the warrant application and failed to review the recordings or transcripts.  (See SUF ¶ 26; SMF ¶ 20.)  However, the interviews were not requested by Starkes in the first place (see SUF ¶¶ 24-26), and there is no indication that she felt review of the interviews necessary to acquire adequate information from the children.  More importantly, there is nothing in the record indicating that Starkes had reason to doubt the accuracy of Officer Catanio and Dominique Smith's representations to her concerning the SAFE interviews.  See Motley, 432 F.3d at 1081 ("law enforcement officers are generally entitled to rely on information obtained from fellow law enforcement officers"); Kastis v. Alvarado, No. 1:18-cv-01325 DAD BAM, 2019 WL 3037912, at *10 (E.D. Cal. July 11, 2019) ("An assertion is made with reckless disregard when 'viewing all the evidence, the affiant must have entertained serious doubts as to the truth of his statements or had obvious reasons to doubt the accuracy of the information he reported.'") (quoting Wilson v. Russo, 212 F.3d 781, 788 (3d Cir. 2000)).  Her failure to review additional information concerning the SAFE interviews thus constitutes, at most, mere "negligence or good faith mistakes"

9

1  that do not sustain a judicial deception claim.  See Ewing, 588

2  F.3d at 1224.

3                    b.   Failure to Investigate Further

4         Plaintiffs also argue that D.O.'s representation that

5  his mother picked him up and carried him around by the neck was

6  so unbelievable that it should have prompted Starkes to further

7  investigate the incident.  D.O.'s description certainly strains

8  credulity, especially given that there were no marks on his neck

9  following the incident and he was twelve years old at the time.

10  (See SMF ¶¶ 2-3, 7, 12; Docket No. 93 at 69.)  Plaintiffs contend

11  that Starkes should have therefore conducted further

12  investigation -- for example by (1) reviewing the audio

13  recordings of the children's interviews with Folsom Police, (2)

14  reviewing the photos taken of D.O. that showed no visible marks

15  or bruising on his neck (in addition to evidence already before

16  her that indicated there were no marks), or (3) further

17  questioning Faun O'Neel (in addition to the interview Starkes had

18  already conducted) -- and that her failure to do so constitutes

19  reckless disregard for the truth.

20         This argument is unavailing, particularly because the

21  warrant application did include Faun O'Neel's alternative

22  description of the December 20, 2020 incident, according to which

23  she only "grabb[ed] [D.O.] by the back of the neck," but did not

24  choke him or pick him up by the neck.  (See Docket No. 93 at 71.)

25  Further, there is no indication that the specific avenues of

26  investigation identified by plaintiffs were so plainly necessary

27  that failure to pursue them constitutes reckless disregard for

28  the truth.  Cf. Butler v. Elle, 281 F.3d 1014, 1025 (9th Cir.

2002) (where warrant was issued for failure to maintain vehicle title, officer's failure to search title database under defendant's legal name and business name, which were known to officer, could support claim for judicial deception).

It is possible that the investigation methods identified by plaintiffs may constitute "best practices." (See, e.g., Sasha Smith Dep. at 79:9-16 (indicating that reviewing photos referenced in a police report prior to writing a warrant application is a practice social workers "should" follow).)  But a failure to abide by best practices does not rise to the level of judicial deception.  As with Starkes' failure to review the SAFE interviews, her failure to investigate the case in the particular manner plaintiffs dictate constitutes, at most, mere negligence that cannot support a judicial deception claim.  See Ewing, 588 F.3d at 1224.

Additionally, it is not clear that further avenues of investigation concerning the choking incident would have yielded information that, if included, would have been material.  As discussed in greater detail below, the choking incident was not the only ground for the warrant.  Even if the choking allegation was excluded, the court cannot say as a matter of law that the warrant would not have been granted.

c.   Omissions from Warrant Application

Finally, plaintiffs point to Starkes' omission of several pieces of information that were known to her, including that (1) the safety plan allegedly did not require that the parents have only one hour of supervised virtual visitation every other day, and therefore the parents were not in violation of the

1  visitation provision by having frequent in-person visitation (see
2  Decl. of Faun O'Neel (Docket No. 88-1 at 94-100) ¶ 27; Decl. of
3  Fara Canutt (Docket No. 88-1 at 90-92) ¶ 4); (2) D.O. told
4  Starkes he felt safe at home and wanted to remain with his mother
5  (SMF ¶ 12); (3) D.O. gave varying descriptions of the part of the
6  incident in which his mother pushed his face either "into" or
7  "towards" the food spilled on the ground (see SMF ¶ 34; Docket
8  No. 93 at 14); (4) D.O. had no physical marks or bruises (see SMF
9  ¶ 2); and (5) the police did not remove the children when they
10  first responded to the home and interviewed the children on
11  December 20, 2020, but rather came back to remove the children
12  two days later (see SMF ¶ 11; SUF ¶ 11).

13         Even if these pieces of information may tend to be
14  exculpatory, they are overshadowed by the specific allegations of
15  physical abuse against multiple children in the home, which are
16  far more salient to the finding of probable cause.  According to
17  the warrant application, D.O. and A.O. "reported history of being
18  physically abused by the mother and the father, which included
19  being choked, spanked with a belt, and slapped in the face"; B.T.
20  "reported being concerned that her mother would hurt her siblings
21  again when she gets angry," particularly D.O. and A.O., who "get
22  more severe punishments . . . including getting hit and pushed";
23  and A.O. "stated that when her mother gets overly mad, she gets
24  smacked, pushed and spanked with a belt" and that "her last
25  spanking by her father was last September or October 2020" (mere
26  months before the December 2020 incident), which left her with
27  "marks and bruises on her legs and her arms."  (See Docket No. 93
28  at 70-72; SUF ¶ 52.)

1        Accordingly, the court concludes that the alleged

2   omissions were immaterial.  Even if the facts pointed to by

3   plaintiffs had been included, the judge most likely would still

4   have granted the warrant based on these allegations, which were

5   not "made misleading by the omission" of the facts relied upon by

6   plaintiffs such that the warrant application "considered as a

7   whole, [was] materially misleading."  See Scanlon, 92 F.4th at

8   799.

9        This conclusion is bolstered by the outcome of the

10  detention hearing, where the plaintiffs were each represented by

11  counsel and a different judge concluded CPS had made a prima

12  facie case that the children met the criteria of Welfare &

13  Institutions Code § 300.  The judge there had before him a fuller

14  factual and procedural record, along with D.O.'s statement that

15  he felt safe at home and wanted to remain at home, and CPS's

16  representation that the only violation of the safety plan was the

17  family's alleged coaching of the children prior to interviews.

18  (See SUF ¶¶ 58-69.)  In ruling, the judge stated: "I find that

19  removal of all the children is appropriate, based on allegations

20  of physical abuse.  One to [D.O.], but also a report of

21  allegations that there is physical abuse to [A.O.] that occurred

22  prior to this.  The allegations seem to suggest this is not an

23  isolated incident that just happened to [D.O.], but this is

24  something that's been ongoing in the family, at least to two

25  children."  (Id. ¶ 70.)

26       As plaintiffs point out, the legal standard applied at

27  the warrant application stage is different than the standard

28  under § 300.  In particular, the warrant required that, in

13

1  addition to making a showing of abuse or neglect under § 300,

2  there were "no reasonable means to protect the child's safety or

3  physical health without removal" pending hearing on the § 300

4  petitions.  See Scanlon, 92 F.4th at 805 (quoting Cal. Welf. &

5  Inst. Code § 340(b)(2)-(3)).  While the judge's conclusion at the

6  detention hearing that CPS has made a prima facie showing under §

7  300 is not equivalent to a finding of probable cause, the outcome

8  of that hearing does make clear that the allegations of a history

9  of excessive corporal punishment against multiple children would

10 have been important at any stage of the case.

11       Based on the foregoing, the court concludes that there

12 is no genuine dispute of material fact tending to show that

13 Starkes committed judicial deception in the warrant application.

14 Accordingly, the court will grant summary judgment on the third

15 claim in favor of defendant Starkes.

16     B.   Qualified Immunity

17       Even if any or all of the allegedly false statements in

18 the warrant application or the alleged omissions from that

19 application were found to constitute judicial deception,

20 defendants would still be entitled to qualified immunity on

21 plaintiffs' Fourteenth Amendment claim unless plaintiffs could

22 establish that defendants acted in violation of clearly

23 established law, such that any reasonable officer in the

24 officers' position would understand that their conduct violated

25 plaintiffs' constitutional rights.  See Pearson v. Callahan, 555

26 U.S. 223, 232 (2009) ("Qualified immunity is applicable unless

27 the official's conduct violated a clearly established

28 constitutional right."); Saucier v. Katz, 533 U.S. 194, 202

(2001) ("The relevant, dispositive inquiry in determining whether a right is clearly established is whether it would be clear to a reasonable officer that his conduct was unlawful in the situation he confronted.")

It may be clearly established that an officer may not make statements in a juvenile dependency petition that he knew to be false or would have known to be false if he had not recklessly disregarded the truth.  See Greene, 588 F.3d at 1035; David, 38 F.4th at 800 (stating that "the right to be free from judicial deception in matters of child custody in beyond debate."). However, the Supreme Court has cautioned us not to define the law at such a high level of generality in defining what is clearly established.  See City of Escondido, Cal. v. Emmonds, 586 U.S. 38, 42 (2019).  In order for the making of such false statements to constitute a Fourteenth Amendment violation the statements must have been material.  In other words, it is not enough that a defendant may have made one or more false statements or omitted one or more facts from a petition.  The statement or omission may support a judicial deception claim only if the allegedly deceived court would have declined to issue the order had the statements not been made or the omitted facts been included.  See David, 38 F.4th at 801.

Accordingly, in determining qualified immunity the more appropriate inquiry is whether the officer made false statements which he knew to be materially false or would have known to be materially false if he had not recklessly disregarded the truth. And with regard to the alleged omissions the appropriate inquiry is correspondingly whether the officer intentionally or with

1    reckless disregard for the truth omitted <u>material</u> facts.

2         In the context of a judicial deception claim,

3    materiality is a question which must be determined by the

4    reviewing court in each instance on a case-by-case basis.  <u>See</u>

5    <u>Chism</u>, 661 F.3d at 389.  Here, this court has determined that

6    none of the alleged misrepresentations or omissions, considered

7    individually or collectively, were material because they did not

8    influence the Juvenile Court Judge in his decision.  But suppose

9    this court had held otherwise and determined that one or more of

10   the alleged misrepresentations were made with knowledge they were

11   false <u>and</u> were material.  Would that conclusion have been clear

12   to any officer in the position of Starkes?  The court concludes

13   it would not, and that a reasonable officer in Starke's position

14   could well have believed that the Juvenile Court Judge would

15   still have issued the detention order even if the allegedly false

16   statements were omitted and the omitted facts were included in

17   the petition.

18        It must not be forgotten that juvenile dependency

19   petitions and the applications for protective custody warrants

20   are typically drafted under exigent circumstances and often

21   considered and granted by a judge the same day they are

22   submitted.  CPS officials cannot be expected to include every

23   fact that may or may not be potentially exculpatory in a

24   protective custody warrant application.  They are not required to

25   provide a comprehensive recitation of every detail of the

26   investigation up to that point.  The warrant application need

27   only include sufficient information to ensure that the facts

28   presented are not "so wrenched from [their] context that the

1   judicial officer will not comprehend how [they] fit[] into the

2   larger puzzle."  See Scanlon, 92 F.4th at 799. Officials need

3   only provide an adequately complete representation of the "total

4   story" so as to not be "materially misleading."  See id.

5   (emphasis added).

6          Plaintiffs have been unable to point to any case,

7   either at the Supreme Court or circuit level, which would have

8   placed Starkes on notice that she could not rely upon the

9   information provided to her by other social workers or law

10  enforcement officers in drafting her application to the court.

11  Much to the contrary, prevailing caselaw suggests they may do so.

12  See Motley, 432 F.3d at 1081.  Nor have plaintiffs been able to

13  identify any caselaw to even suggest to Starkes that she had a

14  constitutional obligation to conduct a further investigation

15  under the circumstances.  See Ewing, 588 F.3d at 1224.

16         As the Supreme Court has taught us, qualified immunity

17  protects "all but the plainly incompetent or those who knowingly

18  violate the law."  Malley v. Briggs, 475 U.S. 335, 341 (1986).

19  There is nothing in the record to permit an inference that

20  defendants here were either plainly incompetent or knowingly

21  violated the law.  Accordingly, even if the court were to

22  conclude that defendants' conduct violated the Fourteenth

23  Amendment, at the very least they would be entitled to qualified

24  immunity.

25       C.   False Imprisonment

26         Plaintiffs allege that Starkes and Smith committed

27  false imprisonment through their misrepresentations in the

28  warrant application.  Defendants do not address the elements of a

17

1   false imprisonment claim, but rather argue that the social

2   workers' communications with the Juvenile Court are privileged

3   under California Civil Code § 47.

4        Section 47 "establishes a privilege that bars liability

5   in tort for the making of certain statements.  Pursuant to

6   section 47(b), the privilege bars a civil action for damages for

7   communications made '[i]n any (1) legislative proceeding, (2)

8   judicial proceeding, (3) in any other official proceeding

9   authorized by law, or (4) in the initiation or course of any

10  other proceeding authorized by law and reviewable pursuant to

11  [statutes governing writs of mandate].'"  Hagberg v. California

12  Fed. Bank, 32 Cal. 4th 350, 360 (2004) (quoting Cal. Civ. Code §

13  47(b)) (alterations in original).

14       Plaintiffs argue that defendants are not immune from

15  tort claims pursuant to section 47 if they satisfy the conditions

16  of California Government Code § 820.21(a), which provides:

17  "Notwithstanding any other provision of the law, the civil

18  immunity of juvenile court social workers, child protection

19  workers, and other public employees authorized to initiate or

20  conduct investigations or proceedings . . . shall not extend to"

21  (1) "perjury," (2) "fabrication of evidence," (3) "failure to

22  disclose known exculpatory evidence," and (4) "obtaining

23  testimony by duress," when any of these acts are "committed with

24  malice."  "Malice" is defined as "conduct that is intended by the

25  person . . . to cause injury to the plaintiff," or "despicable

26  conduct that is carried on . . . with a willful and conscious

27  disregard of the rights or safety of others."  Id. at §

28  820.21(b).

1        Plaintiffs are correct in that "[t]he language of

2   section 820.21 includes 'notwithstanding any other provision of

3   law' which makes it clear that section 47 cannot be interpreted

4   without consideration of section 820.21." See Parkes v. County

5   of San Diego, 345 F. Supp. 2d 1071, 1085–86 (S.D. Cal. 2004).

6        Plaintiffs contend that if they have established a

7   genuine issue of material fact as to judicial deception, they

8   have also done so with respect to the exception to immunity under

9   section 820.21.  However, as discussed above, the court concludes

10  that the record presents no genuine dispute of material fact

11  tending to show that Smith or Starkes engaged in judicial

12  deception based on any false representations or omissions.  There

13  is thus likewise no dispute of fact as to whether they fabricated

14  evidence or failed to disclose exculpatory evidence with malice.

15       Section 820.21 therefore does not apply to Smith and

16  Starkes, and they are immune from the false imprisonment claim

17  pursuant to the section 47 litigation privilege.  Cf. id. at 1086

18  (because "there is a genuine issue of material fact as to whether

19  [defendants] failed to disclose to the court exculpatory evidence

20  with malice . . . [defendants] are not entitled to summary

21  judgment based on the section 47(b) litigation privilege").

22  Accordingly, the court will grant summary judgment in defendants'

23  favor on the seventh claim.

24       D.   Municipal Liability

25       "To sustain their Monell claim, [plaintiffs] must show

26  that the action that caused their constitutional injury was part

27  of an 'official municipal policy of some nature.'"  Scanlon, 92

28  F.4th at 811 (quoting Monell, 436 U.S. at 691)).  The existence

19

1   of such a "policy" may be shown in several ways, including by (1)

2   "prov[ing] the existence of a widespread practice that, although

3   not authorized by written law or express municipal policy, is so

4   permanent and well settled as to constitute a custom or usage

5   with the force of law," City of St. Louis v. Praprotnik, 485 U.S.

6   112, 127 (1988) (plurality opinion) (citation and internal

7   quotation marks omitted), or (2) demonstrating that the

8   municipality failed to adequately train employees so as to avoid

9   the constitutional violations that occurred, see City of Canton,

10  Ohio v. Harris, 489 U.S. 378, 388 (1989).

11          Plaintiffs allege that the County of Sacramento is

12  liable based on (1) a "take one, take all" policy whereby CPS

13  automatically removes all children from a home even if "only one

14  [child] is the subject of allegations which might justify

15  removal" (SAC ¶¶ 159-60); (2) inadequate training or supervision

16  of social workers with respect to the constitutional rights that

17  must respected in the course of removal proceedings (id. ¶¶ 153-

18  55); and (3) a longstanding practice of improperly removing

19  children without probable cause by engaging in judicial deception

20  (id. ¶¶ 158, 167).

21          The parties have not identified any evidence in the

22  record concerning the "take one, take all" policy.  To the

23  court's knowledge, the only evidence concerning the training of

24  County social workers indicates that social workers are trained

25  to be honest in their dealings with the juvenile courts and

26  respect families' constitutional rights.  (See Dominique Smith

27  Dep. at 37:06-12; Starkes Dep. at 40:08-41:11; Docket No. 88-1 at

28  104-11.)

1    In support of their allegation of a longstanding

2 practice of judicial deception, plaintiffs cite three cases

3 brought against the County of Sacramento wherein social workers

4 were alleged to have engaged in judicial deception.  However,

5 these cases do not constitute evidence the court can rely upon.

6 Two of them settled prior to summary judgment.  (See Henao v.

7 County of Sacramento, 2:22-cv-00352 MCE KJN, Docket Nos. 24-29;

8 Welch v. County of Sacramento, 2:07-cv-00794 GEB EFB, Docket Nos.

9 14-35.)  Olvera v. County of Sacramento, 2:10-cv-550 WBS KJM,

10 made it to summary judgment, but the court only determined that

11 there was a dispute of material fact as to whether the social

12 workers engaged in judicial deception, see 932 F. Supp. 2d 1123,

13 1165 (E.D. Cal. 2013) (Shubb, J.), and the case settled before

14 trial (see Olvera Docket Nos. 208-221).

15    Plaintiffs also provide declarations from Joseph Henao

16 and Jonathan Welch (see Docket No. 88-1 at 11-15, 124-27), the

17 plaintiffs in the Henao and Welch matters cited above.

18 Plaintiffs stated in their opposition that these witnesses were

19 "disclosed in Rule 26 statements," but do not provide

20 documentation to support that assertion.  (See Opp'n at 29.)  In

21 reply, defendants provided a copy of plaintiffs' Rule 26 initial

22 disclosures, which do not disclose Mr. Henao and Mr. Welch.  (See

23 Docket No. 103-3 at 13-22.)

24    "If a party fails to provide information or identify a

25 witness as required by Rule 26(a) or (e), the party is not

26 allowed to use that information or witness to supply evidence on

27 a motion, at a hearing, or at a trial, unless the failure was

28 substantially justified or is harmless."  Fed. R. Civ. Proc.

21

1   37(c)(1).  As plaintiffs have shown neither that the witnesses

2   were properly disclosed nor that any failure to disclose was

3   justified or harmless, the court cannot consider the declarations

4   of Mr. Henao and Mr. Welch.  See Merch. v. Corizon Health, Inc.,

5   993 F.3d 733, 740 (9th Cir. 2021) ("Rule 37(c)(1) is an

6   'automatic' sanction that prohibits the use of improperly

7   disclosed evidence," which litigants can "escape . . . only if

8   they prove that the discovery violations were substantially

9   justified or harmless") (quoting Yeti by Molly, Ltd. v. Deckers

10  Outdoor Corp., 259 F.3d 1101, 1106 (9th Cir. 2001)).[4]

11          Because there is no evidence before the court to

12  support any of plaintiffs' Monell theories, the court will grant

13  summary judgment in favor of defendant County of Sacramento on

14  the sixth claim.

15          IT IS THEREFORE ORDERED that defendants' motion for

16  summary judgment be, and the same hereby is, GRANTED in favor of

17  defendants on the third claim for judicial deception, sixth claim

18  under Monell, and seventh claim for false imprisonment.

19          IT IS FURTHER ORDERED that, based on plaintiffs'

20  abandonment of the claims, the fourth and fifth claims alleging

21  judicial deception in other court filings are hereby DISMISSED.

22  Dated:  April 18, 2024

23  _____
    WILLIAM B. SHUBB
24  UNITED STATES DISTRICT JUDGE

25

26  _____

27       [4]    At oral argument, plaintiffs' counsel stated that he
    failed to disclose the declarants in accordance with Rule 26 and
28  conceded that it would be improper for the court to consider
    their declarations.